**UNITED STATES of America**
**v.**
**Irving Thomas HARRIS.**
**Crim. No. 13219.**

United States District Court
E. D. Virginia,
Norfolk Division.

Nov. 14, 1967.

C. V. Spratley, Jr., U. S. Atty., and Roger T. Williams, Asst. U. S. Atty., Norfolk, Va., for plaintiff.

Frederick T. Stant, Jr., Norfolk, Va., for defendant.

MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

The defendant is before the Court on a seven-count indictment charging violations of 18 U.S.C.A. Section 1952, commonly denominated the antiracketeering

statute[1] which became the law of the land on September 13, 1961.

As applied to the facts of this case, the crimes committed were using the mails in interstate commerce with intent to promote, manage, carry on, or facilitating the promotion, management, or carrying on an unlawful activity namely, the ancient game of dice throwing, more commonly referred to as crap games, and thereafter performing or attempting to perform such "unlawful activity" in the form of a business enterprise involving gambling.

Manifestly the statute was not intended to reach all participants in dice games. Nevertheless, it apparently is sufficiently broad to encompass those individuals using an interstate facility, including the mails, where the interstate activity is sufficiently related to the subsequent performance or attempted performance of any gambling-business enterprise. In a prosecution under a related statute, 18 U.S.C. Section 1953, the Supreme Court, in United States v. Fabrizio, 385 U.S. 263, 87 S.Ct. 457, 17 L.Ed.2d 351 (1966), upheld an indictment charging Fabrizio with knowingly carrying in interstate commerce, from New Hampshire to New York, 75 acknowledgments of purchase for a sweepstake race in New Hampshire (where such sweepstakes are legal) to be used, and adapted, devised and designed for use, in a wagering pool, i. e., a sweepstake race in New Hampshire. The broad scope of the statute was there emphasized. The Supreme Court, in refuting the contention that Fabrizio had "no use" in the sweepstakes, said: "But common sense and ordinary experience negative such a formalistic conclusion." It was held that, even though the indictment did not so charge, it was sufficiently broad to include a contention that the tickets purchased and transported in interstate commerce by Fabrizio were in fact being delivered to out-of-state ticket owners who had not themselves purchased the tickets in New Hampshire but had done so through Fabrizio; this despite the fact that the bill of particulars made no mention of this contention. *Fabrizio* likewise stands for the principle that Section 1953 is not limited to organized crime.

On September 23, 1966, at approximately 11:30 a. m., Agents Egan and Sanderlin of the Federal Bureau of Investigation arrived at the defendant's home in Portsmouth, Virginia, armed with a search warrant.[2] After identifying themselves and fully explaining to the defendant his constitutional rights in accordance with Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, the search revealed, among other items, 101 boxes of dice (4 to a box), 59 loose dice, 14 empty dice boxes (11 bearing the label of H. C. Edwards & Co. as hereinafter described) and 5 dice cups. Included among the 101 boxes were 97 bearing the label, "Bryant 9-2082. Per dice hard, true and square, H. C. Edwards & Co., 315 West 39th Street, New York, New York." According to a stipulation duly signed by the defendant and his counsel, the evidence

---

1. Title 18, Section 1952, U.S.C., provides (in pertinent parts):

"(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in sub-

paragraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

"(b) As used in this section 'unlawful activity' means (1) any business enterprise involving gambling * * * in violation of the laws of the State in which they are committed or of the United States, * * * "

2. The validity of the search and seizure has been heretofore determined and appropriate findings and conclusions have been filed.

conclusively establishes that the defendant ordered from H. C. Edwards & Company, and the latter shipped to the defendant, on the dates alleged in the indictment quantities of dice, and that such dice seized on September 23, 1966, were manufactured by this concern.

The record indicates that the dice were of varying dimensions; either ⅝ of an inch, ¹¹⁄₁₆ of an inch, or ¾ of an inch. Unlike the drugstore variety dice, the dice manufactured by H. C. Edwards & Company in New York are perfected to within ¹⁰⁄₁₀₀₀ of an inch and are not available locally at retail stores; they are priced at 80 cents each, and are used almost exclusively in professional dice games, although it must be conceded that these dice could be used in any harmless home game not involving gambling.

During the course of the search of the premises, and after defendant had been fully advised of his rights, defendant made certain damaging statements. Agent Sanderlin located a telephone bill for the premises described as 1442 East Ocean View Avenue, Norfolk, Virginia. When questioned as to these premises defendant said, "Yes, that's my place, and I've used these dice to hold a crap game down there." Defendant was arrested at 12:26 p. m. and arrangements were immediately made to take him before a United States Commissioner for a hearing that same afternoon at 3:30 or 4:00 p. m. Again fully advised of his constitutional rights by the Commissioner, including the right to remain silent and the right to counsel, defendant executed a waiver of his right to counsel and made certain other damaging statements. According to Agent Egan, defendant told the Commissioner "that the dice that we [the agents] had obtained at his house on that day pursuant to the search warrant had been ordered by him from New York for the specific purpose to use in

a crap game in Norfolk," and that "He [the defendant] had been playing dice all his life and shooting crap for a living and saw nothing wrong with it."[3]

Further testimony developed that defendant rented an unfurnished (except for a stove and refrigerator) house at 1442 East Ocean View Avenue, Norfolk, Virginia, for the period beginning July 1, 1965, and ending June 30, 1966. The defendant paid, on July 29, 1965, the sum of $1,550.00 for one year's rent in advance, plus a $50.00 security deposit, and the real estate agent mailed the receipt and the keys to the defendant at defendant's home at 300 Constitution Avenue, Portsmouth, Virginia.

The professional and semi-professional gamblers called to testify each stated that the dice seized pursuant to the search warrant were "similar" to dice used in various dice games. No single witness identified the defendant as being present at any dice game at 1442 East Ocean View Avenue, although one witness admitted attending a dice game in a "sparsely furnished" house on East Ocean View Avenue unidentified by number.

That defendant was engaged in a business enterprise involving gambling is corroborated by the testimony of Julius S. Peck, the president of Peck Iron and Metal Company whose office is located at 3850 Elm Avenue (formerly King's Highway), Portsmouth, Virginia. Peck, while refusing to concede that he had been engaged in any dice games with defendant within a period of "about" two years prior to the hearing on July 24, 1967, freely admitted that dice games had been staged at his place of business commencing approximately eight years ago. Peck described these games as "friendly" and referred to the defendant as a "mediator," and "arbitrator," and a "moderator." The games were conducted on an average of twice each month,

---

3. Agent Sanderlin's version of what defendant said to the Commissioner closely parallels Egan's statement as follows: "He [the defendant] indicated to the Commissioner and to all those present that he had used these dice in operating a game in Norfolk—a crap game—and he couldn't understand why he was being arrested because, as far as he was concerned, there wasn't any violation in running a crap game—no federal violation."

and the number of participants ranged from 2 to 4 players; never more than 4. Defendant furnished the dice on some occasions; Peck at other times. Peck obtained his dice from Las Vegas. Examining the seized dice, Peck referred to them as "similar in appearance" to the dice used in games in which defendant and Peck participated. As "friendly" as these games may have appeared to Peck, the evidence discloses that the defendant was more than a casual participant. Defendant insisted upon a limit of $100.00 per roll. Defendant occasionally furnished a green cloth with numbers on same, but the numbers were always turned down, thus leaving a blank green cloth. Peck testified that the defendant made "all rules," and that in betting against the defendant the ace-deuce combination resulted in a win for the defendant but, as between other players *inter sese*, the ace-deuce combination was considered a "standoff" with neither party winning. In sum, defendant was receiving an extra advantage as the "house man." Peck likewise stated that no dice games were conducted at Peck's office unless the defendant was present.

The totality of the circumstances establishes beyond any reasonable doubt that defendant *at least* facilitated the promotion, management, or carrying on of a business enterprise involving gambling at 3850 Elm Avenue, Portsmouth, Virginia, and 1442 East Ocean View Avenue, Norfolk, Virginia. Other locations mentioned in the bill of particulars are insufficiently identified on this record. The evidence, when coupled with defendant's admissions, conclusively establishes that certain dice shipped in interstate commerce from New York were intended to be used in dice games with a marked degree of continuity, and were in fact so used.

The more difficult question presented is the obvious inability of the prosecution to prove the particular dice used in a particular dice game and, to a lesser extent, on what particular date. A reading of the statute does not suggest that this need be established. Congress surely did not intend that, to support a conviction, it is necessary to determine which dice contained in 97 boxes mailed from New York were used in a particular game at a particular time and place. Especially is this true where we note that eleven *empty* dice boxes bearing the New York label were found at defendant's premises. Assuming arguendo the correctness of Peck's estimate as to when he last engaged in a dice game with defendant, the various dice shipments from New York were spread out over a period of four years beginning as early as March 13, 1962. Surely any reasonable person would reach the inevitable conclusion that one or more pairs of the New York dice were used in the games conducted at Peck's office.

We conclude, however, that evidence establishing the actual use of the dice found in defendant's home following the shipment in interstate commerce is not required under Section 1952. What is necessary is that the mails were used *with intent* to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of an unlawful activity, to-wit, the promotion of dice games. While not factually identical, we believe that the recent case of United States v. Miller, 379 F.2d 483 (7 Cir., 1967), sufficiently establishes this to be the law.[4] However, as noted above, the defendant's state-

4. In United States v. Zizzo, 338 F.2d 577, 580 (7 Cir., 1964), it was said that no act need be committed subsequent to the interstate movement; that the intent to commit an act proscribed by the statute was the requisite. In Bass v. United States, 324 F.2d 168 (8 Cir., 1963) it was deemed sufficient to convict Bass even though there was no direct evidence that he aided or abetted or caused or induced his employees to travel interstate, or that he sought them out and procured them to work for him. It has been said that interstate travel with a requisite intent plus a subsequent act in furtherance of that intent, is all that is required. Proof of gambling as such is unnecessary. United States v. Bergland, 318 F.2d 159 (7 Cir., 1963).

ments to the agents of the FBI and the United States Commissioner abundantly prove that certain dice shipped and received in interstate commerce were used in dice games as a continuous course of conduct. The intent as an element of an offense may be inferred from the established facts. United States v. Compton, 355 F.2d 872, 874 (6 Cir., 1966). Evidence of a substantial course of illegal conduct, occurring a reasonable time before and after an act of interstate travel, permits the fact-finder to infer that the travel or interstate activity was undertaken with the intent to carry on the unlawful activity. United States v. Sapperstein, 312 F.2d 694 (4 Cir., 1963); United States v. Farber, 336 F.2d 586 (6 Cir., 1964); United States v. Compton, supra. The evidence of the defendant's intent in the present case is overwhelming.

Defendant relies upon United States v. Honeycutt, 311 F.2d 660 (4 Cir., 1962). There is no comfort to the defendant in *Honeycutt*. Honeycutt was charged as an aider and abettor with respect to the transportation from Tennessee to North Carolina of certain tip boards and pull boards purchased and transported by one Bryant. While Bryant was clearly guilty, the evidence fell far short of any knowledge on the part of Honeycutt of Bryant's trip to Tennessee and return. As suggested by United States v. Barrow, 363 F.2d 62, 65 (3 Cir., 1966), the *Honeycutt* case does *not* stand for the proposition that the interstate travel was an integral part of and essential to the gambling operations.

In describing the "unlawful activity" which the defendant is charged with facilitating, the indictment refers to Sections 18.1–321 and 18.1–340, which do not cover a dice game. The proper statute to be cited was Section 18.1–316 which provides: "Any person who shall bet, wager or play at any game for money or other thing of value shall be fined not exceeding one hundred dollars, or confined in jail not exceeding sixty days, or both." The prosecution was required to furnish a bill of particulars which clearly states that "the defendant established, promoted, managed and carried on dice games at the locations described in paragraphs 1 and 2 of this bill of particulars, in violation of the laws of the Commonwealth of Virginia." The indictment correctly refers to 18 U.S.C. Section 1952 and, in addition, specifies "a dice game" as the "unlawful activity." Rule 7(c) of the Federal Rules of Criminal Procedure protects an erroneous citation of a statute in the absence of misleading the defendant to his prejudice. There is no intimation that either the defendant or his attorney was misled by the incorrect citation. The point merits no further discussion. Davis v. United States, 279 F.2d 576 (4 Cir., 1960).

Finding the defendant guilty under each of the counts of the indictment, the defendant's motion for a judgment of acquittal made at the conclusion of all of the evidence will be denied and the defendant shall appear before the Court for sentencing following the completion of a presentence report.