**Thomas Edward HANLEY, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 23467.**

United States Court of Appeals
Fifth Circuit.

Sept. 29, 1969.

Rehearing Denied
Oct. 28, 1969.

David W. Walters, Edward N. Moore, Richard R. Booth, Walters, Moore & Costanzo, Miami, Fla., for appellant.

Michael J. Osman, Asst. U. S. Atty., William G. Earle, Atty., Dept. of Justice, Miami, Fla., William A. Meadows, Jr., U. S. Atty., William D. Hyatt, Atty., U. S. Dept. of Justice, Washington, D. C., for appellee.

Before JOHN R. BROWN, Chief Judge, and COLEMAN and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

The appellant with two other defendants, Seider [1] and Turbin [2], was charged in a seven-count indictment with separate but similar violations of Title 18, U. S.C., Sec. 1952.[3] The trial court grant-

---

1. Indicted under Counts One, Two and Three.

2. Indicted only under Count Seven.

3. Title 18, U.S.C., Sec. 1952, reads in pertinent part as follows:

"(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to * * *

(3) otherwise promote, manage, establish, carry on, or facilitate, the promotion, management, establishment, of carrying on, of any unlawful activity, and thereafter performs or attempts to

ed motions for judgment of acquittal on behalf of Seider and Turbin at the close of the government's case. Hanley's similar motion was denied, whereupon Hanley rested without offering any evidence in his own behalf. Hanley was acquitted by the jury as to Count Four and found guilty under the remaining counts.[4] His renewed motion for judgment of acquittal or in the alternative for a new trial was denied. Sentence was thereafter imposed [5] and this appeal followed.

Viewed in the light most favorable to the government [6] the evidence may be summarized as showing the following. Thomas Edward Hanley was the owner and proprietor of Hanley's Restaurant in Marathon, Florida. For a number of years the upstairs of the restaurant building had been used for gambling operations. Hanley kept the keys to the gambling area. Participants for the gambling business were obtained from among persons dining in the restaurant who were steered upstairs and into a game known as "Nevada Bank", "Razzle Dazzle" or "Nevada Craps", a dice game played with eight dice. The appellant did not take an active part in the game but was often the one who guided the victims upstairs, and he customarily stayed nearby so as to be on hand to okay the victims' checks, which were made out to cash.

These checks were then taken to the First National Bank of Homestead, Florida, for collection. An arrangement existed with the bank whereby the checks brought to the bank for collection (sometimes by appellant and sometimes by others connected with the establishment) were immediately airmailed to the drawee bank with a request to "wire fate". The checks were sealed in envelopes and mailed to or placed under the door of the bank. The envelopes were put on the desk of Mr. Losner, the bank President, who, in turn, would pass them on to Mrs. Martin, the Vice President in charge of collections. She made out a collection form for each check. The special instruction blank on the collection slip customarily read "Please wire fate immediately. Mrs. Martin, Vice President. T. H." The "T. H." represented the appellant's initials. Under the "wire fate" procedure the Home-

---

perform any of the acts specified shall be fined not more than $10,000 or imprisoned for not more than five years or both."

4. A typical count is set forth:

"The Grand Jury charges:

COUNT ONE

That on or about the 2nd day of January, 1964, in the Southern District of Florida, the defendants,

THOMAS EDWARD HANLEY

and

GILBERT J. SEIDER

a/k/ 'Doc Apple'

did use and wilfully cause others to use a facility in interstate commerce, to-wit: the United States mail by wilfully causing The First National Bank of Homestead, Florida to place in the mails for collection a check in the amount of Thirteen Thousand Dollars ($13,000.00), drawn by Hugh J. Kolowich on The First National Bank of Denver, Denver, Colorado, with the intent to promote, manage, establish and carry on and facilitate the promotion, management, establishment and carry-ing on of an unlawful activity, to-wit: a business enterprise involving gambling, in violation of Sections 849.01 and 849.-02, Florida Statutes (1961) [F.S.A.], and that thereafter the defendants did perform and attempt to perform acts to promote, manage, establish and carry on, and facilitate the promotion, management, establishment and carrying on of said unlawful activity, to-wit: the carrying on of 'Nevada Bank', craps and other games of chance in Hanley's Marathon, Florida, all in violation of Title 18, United States Code, Sections 2 and 1952."

5. The sentence was as follows: Nine months imprisonment as to Count one, a committed fine of $10,000 as to each of Counts Two and Three, with the imposition of sentence suspended and three years concurrent probation as to Counts Five, Six and Seven, to commence upon defendant's release from confinement as to Count One.

6. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Ruiz v. United States, 5 Cir. 1967, 374 F.2d 619.

stead bank would airmail the check to the drawee bank which would in turn wire the Homestead bank whether or not payment had been stopped. If the check was honored the Homestead bank would receive a cashier's check from the drawee bank. This check would be cashed and the proceeds placed in a sealed envelope and given to Mr. Losner, the President, who would give the envelope and the cash to Hanley or to McDermott, one of Hanley's employees. The "thereafter" and "facilitate" allegations of each of the counts were proved by evidence of gambling after the last date charged in the indictment, April 10, 1964 (as to Counts Two and Three).[7]

In urging that error was committed below, the appellant raises seven questions.[8] We fail to find reversible error demonstrated and accordingly affirm the lower court.

## I.

■ We deal first with Hanley's last two questions, since they involve the sufficiency of the evidence, discussed immediately above. He asserts error in the denials of his motions for judgment of acquittal, made first at the close of the evidence, and as renewed after verdict and he also questions the lower court's denial of his motion for new trial. Primarily, two contentions are made: first, that the evidence was lacking in proof that *appellant* used or caused the mails to be used, and second, that the evidence was not sufficient to show that the appellant used the mails with intent to promote, manage, establish or carry on the illegal activity, gambling. The detailed statement of the evidence above refutes these contentions. We make the following additional observations. The practice outlined for collecting the checks had gone on for many years prior to the specific checks described in Counts One, Two, Three, Five and Seven. The business of gambling was carried on before and after the handling of the indictment checks. This was sufficient to permit the jury to infer that the mails were used with the knowledge and at the instance of Hanley, and further to infer that he caused the use of the mails by the Homestead bank with the intent denounced by the statute, to promote, manage, establish, carry on and facilitate the unlawful activity named, the business of gambling in violation of Sections 849.01 and 849.-02, Florida Statutes Annotated. With the illegal activity occurring both before and after the use of the mails, the inference by the jury of the requisite intent on the part of Hanley was entirely proper. United States v. Compton, 6 Cir. 1966, 355 F.2d 872, United States v. Harris, E.D.Va.1967, 275 F.Supp. 161.[9]

Additionally, with respect to the denial of his motion for new trial Hanley argues that he was prejudiced by the trial court's refusal to sever the cases of Seider (as to Counts One, Two and Three) and Turbin (as to Count Seven). It will be recalled that judgments of

---

7. Count One involved the earliest date, January 2, 1964, and the remaining counts referred to dates between then and April 10, 1964, the dates of the offenses charged in Counts Two and Three. There was thus additional proof of subsequent gambling operations as to Counts One, Five, Six and Seven.

8. We will discuss the points raised by appellant in inverse order, inasmuch as this is a more logical arrangement for our purposes.

9. The cases cited in the text arose under Title 18, U.S.C. Sec. 1952, the statute we deal with here. For other cases holding that evidence of a course of illegal conduct occurring both before and after an alleged offense may be considered by the jury as proof of a specific illegal intent, see, among others, the following cases: Flanagan v. United States, 5 Cir. 1962, 308 F.2d 841, cert. denied 374 U.S. 838, 83 S.Ct. 1889, 10 L.Ed.2d 1059 (1962); Lindsey v. United States, 5 Cir. 1956, 227 F.2d 113, cert. denied 350 U.S. 1008, 76 S.Ct. 653, 100 L.Ed. 869 (1956); Cohen v. United States, 5 Cir. 1941, 120 F.2d 139; United States v. Farber, 6 Cir. 1964, 336 F.2d 586; United States v. Sapperstein, 4 Cir. 1963, 312 F.2d 694; Brooks v. United States, 10 Cir. 1962, 309 F.2d 580.

acquittal were granted the other two defendants when the government rested. We have difficulty following this argument. Joinder of the offenses met every requirement of Rule 8(a), Federal Rules of Criminal Procedure. The abuse of discretion as to relief from prejudicial joinder by severance under Rule 14, Federal Rules of Criminal Procedure, is, in our judgment, clearly not demonstrated.[10]

## II.

Also entirely without merit is the fifth question raised by appellant, that the trial court should have granted his motion for judgment of acquittal made at the end of the prosecutor's opening statement. The argument is that because proof of the indictment charges would require proof of unlawful activity, i. e., violation of the Florida gambling statutes named in each count of the indictment, Sections 849.01 and 849.02, the prosecutor's failure in his opening statement to advise the jury that the appellant's acts were a violation of these statutes required that the motion be granted. He asserts, in a word, that assuming the government proved everything the Assistant U. S. Attorney said it would prove, it would still be impossible to convict the appellant under any count of the indictment.

The statement of the prosecuting attorney related the evidence to be brought out from the several witnesses, and the count or counts of the indictment which the evidence of the named witnesses would tend to prove, as well as a composite statement as to the effect of the proof generally. Specifically the prosecutor detailed the gambling operations of the upstairs room of the restaurant. There was no question but what the conduct related would constitute a violation of the Florida gambling laws, so that if the proof followed the opening statement it would be in order at an appropriate time for government counsel to request the court to take judicial notice of the Florida gambling laws and to instruct the jury regarding them.

■ The Supreme Court in a civil case, Best v. District of Columbia, 291 U.S. 411, 54 S.Ct. 487, 78 L.Ed. 882, 883 (1934) confirmed the power of the trial court to direct a verdict for the defendant when plaintiff's counsel by opening statement establishes that plaintiff has no right to recover, saying "The power of the court to act upon facts conceded by counsel is as plain as its power to act upon facts produced". The application of this principle to criminal cases is discussed in McGuire v. United States, 8 Cir. 1945, 152 F.2d 577:

> "There is no question of the power of a trial court to direct a verdict upon the opening statement of counsel. (Citing Best v. District of Columbia, supra.) But it is equally well established by the authorities that this power should be exercised *only when it clearly and affirmatively appears* from the opening statement that the charge against the defendant cannot be sustained *under any view of the evidence consistent* with the statement. Stuthman v. United States, 8 Cir. [1933], 67 F.2d 521, 523." (Emphasis supplied)

It seems to us clear that in the instant case the opening statement of the government, simply by omitting citation of the Florida gambling laws, did not make it affirmatively appear that the government had no case.

## III.

In what he numbers as Point Four appellant strenuously contends that reversal is required because the trial judge refused to grant his motion for mistrial based on alleged improper remarks of the prosecutor in his jury summation. The statements were:

> "You heard the bank president. Either he gives a sealed envelope to Hanley; he gives it to his brother-in-law,

10. Leach v. United States, 5 Cir. 1968, 402 F.2d 268, cert. denied 393 U.S. 1082, 89 S.Ct. 864, 21 L.Ed.2d 775 (1969); Garcia v. United States, 5 Cir. 1963, 315 F.2d 679.

or he leaves it there with people under his control to give it to Tom Hanley. That's a nice deal. That's even a better deal than the way it looks from the evidence."

and

"Remember, Mrs. Martin told you that every time after the payment is stopped or the collection is made she sends a copy of the form back, and Mr. Losner said he gives that either to Mr. Hanley or his agent, or he leaves it with someone to give to them so that they know every time it is 'wire fate', and the proceeds."

Actually, Mr. Losner, the bank president, had said: "If I were in the bank and Mr. Hanley came in I would give the envelopes to Mr. Hanley or if I were not in the bank, at times Mrs. Martin would". And further: "If I were not there, the head teller or other person would deliver envelopes".

He also said that he had personally given envelopes to Mr. Hanley and on two or three occasions to another person, Mr. McDermott. Nowhere in the record is McDermott identified as Hanley's brother-in-law, but he is shown to have been an employee of Hanley's. The second quoted portion of the jury argument referring to Hanley's "agent" is thus borne out by the evidence, but not the first quoted reference to his brother-in-law. The common sense view adopted by the trial court we think was sound.

■ The motion for mistrial was made and rather summarily denied as soon as the jury retired for a short rest, at the end of the Assistant U. S. Attorney's closing argument, and prior to the court's charge to the jury. The point was preserved and argued on motion for new trial, Hanley's counsel adverting to the "substantial influence" test of Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946): "The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence.

If so, or if one is left in grave doubt, the conviction cannot stand".

The views of the trial judge were thus expressed:

"There is no doubt that the Assistant U. S. Attorney referred to him as a 'brother-in-law' and in order to do that he went outside the record, if he was, in fact, a brother-in-law. I thought about that and was concerned about it at the time; but remembered that there was a lot of testimony to the effect that he was a bouncer down there at Hanley's Bar and he sat on a stool up there in the gambling room, and he was present, and different ones recognized him and pointed him out as being the man, so then I decided that what great difference does it make whether he was the brother-in-law or just an employee, or an agent, or some kind of an associate down there in the operation of that business."

and further:

"Well, there is no doubt that the prosecutor made the statement, and there is no doubt that it was not in evidence, and that he went outside the record, and if it was, in fact, prejudicial—perhaps, I should have done more than I did do about it, but it is my view that in view of all of the evidence about this fellow's presence down there and the activities that were attributed to him, that it was not and could not be any more prejudicial than —that it wasn't prejudicial".

This position is completely sound and we . are not persuaded that the slight deviation from the record by the Assistant U. S. Attorney under these circumstances had "substantial influence" on the jury's verdict. Whether McDermott was brother-in-law or bouncer, brother-in-law or longtime employee, simply was of no real significance whatever.

We recently had occasion to state, dealing with another apparently inadvertent and unintentional misstatement by a prosecuting attorney:

"This is not a case of prosecutorial overkill in argument by striking foul

blows or using improper methods calculated to produce a wrongful conviction".

Billy Wayne Posey, et al. v. United States of America, 5 Cir. 1969, 416 F.2d 545 [July 17, 1969, at page 553 of slip opinion].

We note further that the trial judge carefully instructed the jury at least twice that the arguments of the attorneys did not constitute evidence and that they should be disregarded if not consonant with the jury's recollection, and in addition: "Remember, now, that it is your recollection that counts and not that of the lawyers nor of the court". As the Supreme Court has said: "Our theory of trial relies upon the ability of jurors to follow instructions".[11]

### IV.

The appellant's first three stated grounds for reversal all deal with the trial court's admission before the jury and treatment in its charge of records of the Homestead bank collection slips identified as Exhibits 20A–20G and 20I–20S under the "business records statute", or "shop book rule", Title 28, U.S.C., Sec. 1732.[12] They present the only really serious questions raised on this appeal. It is convenient to treat them together in this portion of our opinion.

The exhibits involved were the collection slips or forms made out by Mrs. Martin to send out with the checks to other banks for collection, previously described. The appellant contends that it was, first, error to admit the collection slips; second, it was error to admit them with the initials "T. H." unobliterated or unexcised; and third and finally, that the trial judge having admitted the collection slips, with the initials "T. H." thereon, the appellant was clearly entitled to a limiting instruction as to their consideration by the jury, embodied in his requested instruction No. 17,[13] which the court refused to give. These contentions will be discussed in the order stated.

■■ Appellant argues that without putting the collection forms in evidence, the government would not have been able to prove the first element of Title 18, U.S.C., Sec. 1952 (footnote 12, supra), i. e., that the appellant used the mails. He argues that they are untrustworthy as containing the conclusions of Mrs. Martin, as to their belonging to "T. H.",

11. Opper v. United States, 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101, 109–110 (1954). The overruling of *Opper*, as to severance by Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed. 476 (1968) does not impair the vitality of the principle quoted.

12. "§ 1732. Record made in regular course of business; photographic copies

"(a) In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

"*All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.*

"The term 'business,' as used in this section, includes business, profession, occupation, and calling of every kind." (Emphasis added)

13. The refused instruction, which followed in part the language of Title 28, U.S.C., Sec. 1732 (footnote 12, supra) read as follows:

"You are instructed that in considering what weight is to be given to the records of the First National Bank of Homestead which have been admitted into evidence, that is the collection forms identified by Mrs. Martin the Vice President of the bank, you may consider the circumstances of the making of such writings or records including lack of personal knowledge by the entrant or maker."

and not simply a clerical record. He asserts that Mrs. Martin could not come into court now and express an opinion as to the checks being the property of Hanley and accepted for collection for him, either from him or from an agent of his. Numerous cases are cited as to what are and what are not business records, none of which have other than general application here. The argument of appellant misses the whole purpose of the exception to the hearsay rule, once described in Evidence texts as the "shop book rule", now codified as Section 1732. The trustworthiness of the records arises because of their being created in the ordinary course of business affairs, as routine recurring entries to identify routine transactions.[14] Mrs. Martin, the bank Vice President in charge of collections, testified that she routinely over a course of ten years filled out similar slips for Hanley and for other customers of the bank, and that since the items were made out to "Cash", the initials "T. H." were routinely placed on them to identify the owner. More, it seems to us, was not required. "T. H.", in this instance, had the same significance as an identifying symbol as the imprint of the raised lettering of a credit card on a charge slip might have in other circumstances. It identified the customer. The argument of the government as to admissibility is substantially embodied in the emphasized portion of Section 1732, footnote 12, supra. We agree with the appellee that the language of the statute, coupled with the supporting testimony present, was sufficient warrant for the reception in evidence of the collection slips.

■ McDaniel v. United States (footnote 14, supra) refutes the argument also

---

14. Some of our cases dealing with the question under consideration are the following: McDaniel v. United States, 5 Cir. 1965, 343 F.2d 785, cert. denied 382 U.S. 826, 86 S.Ct. 59, 15 L.Ed.2d 71 (1965); Missouri Pacific Railroad Company v. Austin, 5 Cir. 1961, 292 F.2d 415; Matthews v. United States, 5 Cir. 1954, 217 F.2d 409, 50 A.L.R.2d 1187; Chapman v. United States, 5 Cir. 1952, 194 F.2d 974. *Missouri Pacific*, supra, recognizes that trustworthiness of a business entry rests primarily on the "regular course of a business test". The Hanley collection forms meet the test. Their inaccuracy or incompleteness went to their weight, not their admissibility. Matthews, supra, at page 413, sets out the test:

"So long as the accuracy and reliability of the records sought to be introduced in evidence have been tested by the fact that a business carries on its own affairs from day to day in reliance upon such records, there is no departure from the standards of accuracy and trustworthiness that were basic in the historic rule permitting testimony from the shop book."

The Hanley method has been previously described. It differed in the filling out of the bank's standard form in that the person presenting the item for identification did not have to be present, or present identification, or endorse the checks, and the depositor blank on the collection form was not filled out, other than the identifying "T. H." at the bottom of the slip. The records were made in hundreds of transactions, every time Hanley brought or sent an out of town check in for collection. The bank unquestionably relied on the forms, no matter how brief or uninformative they might appear to casual inspection, for the handling and proper routing of thousands and thousands of dollars over a long period of time. This supplied authenticity.

Wigmore states in 5 Wigmore, Evidence (3rd ed. 1940) § 1522, that one of the reasons justifying the admission of regular business entries is:

"Since the entries record a regular course of business transactions, an error or mis-statement is almost certain to be detected and the result disputed by those dealing with the entrant; misstatements cannot be safely made, if at all except by a systematic and comprehensive plan of falsification".

If Mrs. Martin had inadvertently applied "T. H." to a non-Hanley matter, (or omitted "T. H." from Hanley matter) the rightful depositor may be expected to have complained when his money was not credited or paid over. The Hanley method was simply an alternative method or procedure, geared to the unusual nature of Hanley's activities but nonetheless a contemporaneous record of events consisting of systematically recurring entries. Experience shows such records to be trustworthy and within the scope of the codified exception to the hearsay rule, Section 1732(a).

advanced by appellant that his Sixth Amendment Rights of Confrontation was violated by admission of the documents. Our holding there is also pertinent to this case in pointing out the discretion committed to trial judges in admitting records under the statute, and the principle that cases affirming the exclusion of business records are not necessarily authority for the reversal of such admissions. The trial judge did not abuse his discretion here.

A corollary contention is that the records were rendered unreliable and untrustworthy by the inclusion of the initials, as representing a conclusion or opinion of Mrs. Martin, not simply a record of a transaction. Heavy reliance is placed upon Standard Oil Company of California v. Moore, 9 Cir. 1958, 251 F.2d 188, to support the proposition that: "a writing cannot ordinarily be considered a memorandum or record of an act, transaction, occurrence, or event unless the recitals in such writing are *factual* in nature". *Moore* was amply distinguished by Continental Baking Company v. United States, 6 Cir. 1960, 281 F.2d 137, 148, in this language: " * * * (Moore) was predicated on the fact that there was no showing that the firm involved had a regular procedure by which the documents were transmitted".

■ In Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645, 144 A.L.R. 719 (1943), rehearing denied 318 U.S. 800, 63 S.Ct. 757, 87 L.Ed. 1163, it was held that the second paragraph of Section 1732(a), (italicized in footnote 12, supra), should not be considered until the other requirements of the statute are met. Our holding that the trustworthiness doctrine has been met means that the other requirements of the statute are fulfilled here. We hold therefore that Mrs. Martin's lack of personal knowledge as to whether Hanley or someone for him left the items for collection affects the weight only and not the admissibility of·the collection slips. See United States v. Re, 2 Cir. 1964, 336 F.2d 306; La Porte v. United States, 9 Cir. 1962, 300 F.2d 878; Continental Baking Company v. United States, supra; Wheeler v. United States, 1953, 93 U.S.App.D.C. 159, 211 F.2d 19, cert. denied 347 U.S. 1019, 74 S.Ct. 876, 98 L.Ed. 1140 (1954), rehearing denied 348 U.S. 852, 75 S.Ct. 21, 99 L.Ed. 671 (1954).

■ The contention that the trial judge, even if the forms were admissible, should have excised the initials "T. H." before permitting the jury to view them, is less troublesome and requires only brief comment here. The argument is advanced that Mrs. Martin's conclusion that the checks should be attributed to Thomas Hanley was opinion evidence, and since she was not qualified as an expert, her opinion (and the damaging initials, of course) should not have been considered by the jury. This would emasculate the statutory language "all other circumstances, *including lack of personal knowledge by the entrant* or maker, may be shown to affect its weight, but * * * not affect its admissibility."

The objection is patently of no merit. Its net effect if sustained would be to require that the only run of the mill business records admissible under Section 1732(a) be those filled out by an expert witness.

■ Finally we come to the point urged that the trial judge committed reversible error in refusing to instruct the jury as requested by appellant's Requested Instruction 17, footnote 13, supra. The government responds that the same subject matter was covered by the court's general charge: "You may consider the opportunity or lack of opportunity of that witness to have seen or heard that which he testified about". The district judge's primary concern as he voiced it was that the charge required him to single out a specific segment of the testimony—indeed the testimony of a single witness, Mrs. Martin—and comment on the weight to be accorded it, rather than to instruct the jury in the proper method of weighing the testimony as a whole.

Abuse of the trial court's discretion in this respect is not demonstrated. The

general instruction alluded to did have the virtue of getting the point across without singling out Mrs. Martin's testimony for separate comment. This was sufficient.[15]

Reversible error is not made to appear in the proceedings below. The judgment of the district court is in all things

Affirmed.

---

15. See Tillman v. United States, 5 Cir. 1969, 406 F.2d 930; Windisch v. United States, 5 Cir., 1961, 295 F.2d 531; Sachs v. United States, 5 Cir. 1961, 293 F.2d 623, cert. denied 368 U.S. 939, 82 S.Ct. 381, 7 L.Ed.2d 338 (1961); Ehrlich v. United States, 5 Cir. 1956, 238 F.2d 481; Adams v. United States, 5 Cir. 1946, 156 F.2d 271, aff'md 330 U.S. 801, 67 S.Ct. 859, 91 L.Ed. 1260 (1947); United States v. Schanerman, 3 Cir. 1945, 150 F.2d 941; McAffee v. United States, 1939, 70 App.D.C. 142, 105 F.2d 21; Lisansky v. United States, 4 Cir. 1929, 31 F.2d 846, 67 A.L.R. 67.