CROMPTON–RICHMOND COMPANY, INC., FACTORS, Plaintiff-Appellee,

v.

James S. BRIGGS, Defendant-Appellant.

No. 75–2658.

United States Court of Appeals, Fifth Circuit.

Oct. 11, 1977.

Thomas C. Shelton, Dennis S. Meir, Atlanta, Ga., for defendant-appellant.

Lipshutz, Macey, Zusmann & Sikes, John M. Sikes, Jr., Atlanta, Ga., for plaintiff-appellee.

Before BROWN, Chief Judge, and COLEMAN and MORGAN, Circuit Judges.

BROWN, Chief Judge:

In the world of corporate finance, the amount of credit one is able to obtain often represents the difference between the success or failure of an enterprise. This case is one in which a skilled and knowledgeable businessman formulated a plan to attempt to bring Grosse Pointe Mills, Inc. (Grosse Pointe), a Rome, Georgia carpet manufacturer, from a losing operation into the capitalist haven of profitability. The plan was to increase sales dramatically in hopes of reversing the nonprofit trend. To do so, Grosse Pointe had to acquire significantly increased inventories of production materials which required obtaining correspondingly greater amounts of credit. The pivotal aspect of this plan for Grosse Pointe, as with all financially weak companies, was how to secure additional credit. How this credit was obtained and how a guarantor seeks to avoid his guaranty obligation is the essence of this diversity based enforcement action which we affirm.

Under the direction of James S. Briggs, chief financial officer and a director of Grosse Pointe, and his hand-picked president for Grosse Pointe's operations, the strategy to get this increased credit for Grosse Pointe was developed and implemented. Briggs knew that Grosse Pointe's ability to obtain ready cash by factoring[1] its own accounts receivable had been extended as far as possible. Thus, any credit for the purchase of increased production inventories had to be procured via credit purchases from the suppliers. One of the earliest suppliers under this scheme was Integrated Products, Inc. which obtained a large yarn contract from Grosse Pointe.

Since Integrated Products did not desire to extend credit directly to Grosse Pointe, it factored the account receivable from the Grosse Pointe purchase. However, before Crompton-Richmond as factor for Integrated, and later for seven other suppliers, would grant credit at Crompton-Richmond's risk for Grosse Pointe purchases, Crompton-Richmond[2] sought and obtained on January 14, 1970, the personal guaranty of James S. Briggs. Thus, the entire scheme as devel-

---

1. Factoring is used in this opinion in its usual connotation. A seller has certain accounts receivable which it acquired from the sale of goods or services. Instead of retaining these accounts receivable until paid by the purchaser, the seller can obtain cash for them by selling, assigning, or borrowing against his accounts receivable. Companies which extend cash on the basis of one's accounts receivable are factors. Generally, these accounts are accepted for less than face value, the difference representing the factor's fee for advancing immediate cash to the seller. One item included in determining this difference is the degree of risk of loss the factor assumes. The accounts receivable may be accepted at the factor's risk or at the client-seller's risk. If taken at the factor's risk, any loss due to the noncollectibility of an account receivable is borne solely by the factor. Otherwise, the seller—not the factor—ultimately bears the loss for worthless accounts receivable.

2. Subsequent to the transactions involved in this lawsuit, Crompton-Richmond sold its factoring business to another corporation. However, it retained the account involving the suppliers of Grosse Pointe.

oped and executed by Briggs was to gain credit for the expansion of Grosse Pointe's business by having suppliers factor the accounts receivable created by Grosse Pointe's purchases [3]—at least for those suppliers unwilling to extend credit directly to Grosse Pointe.

At the time James Briggs executed the guaranty agreement to ensure that Grosse Pointe obtained its inventory purchases on credit, only an initial purchase of approximately $50,000 from Integrated was involved. However, Briggs did not sign a limited guaranty. The agreement covered "any concern for which [Crompton-Richmond] may now or in the future act as factors to extend credit to Grosse Pointe Mills, Inc." Essentially Briggs was personally guarantying present and future contracts, obligations, and indebtedness of Grosse Pointe which Crompton-Richmond factored. Also included in the guaranty agreement was a waiver of any notice requirements and any basis for Briggs' discharge except for full payment of Grosse Pointe's liabilities to Crompton-Richmond.[4]

3. Indeed, this is expressly stated in the guaranty agreement.

4. The guaranty agreement executed by Briggs covers, among other items, the following:

"To induce you to extend or to permit any concern for which you may now or in the future act as factor to extend credit to GROSSE POINTE MILLS, INC. (Hereinafter called the 'Customer') and/or to factor or to accept assignments or transfers of accounts receivable or other obligations owing from the Customer, and/or to accept the Customer as a credit risk and/or to grant or extend any benefit or financial accommodation to the Customer, and/or in consideration of your so doing, of your having heretofore done any of the foregoing, the undersigned . . . agree to be, without deduction by reason of setoff, defense or counterclaim of the Customer, or loss of contribution from any co-guarantor hereunder, jointly and severally primarily liable to you for the due performance of all of the Customer's contracts and agreements with you, both present and future and any and all subsequent renewals, extensions, continuations, modifications, supplements and amendments thereof, and for the prompt payment to you with interest, of any and all sums which may be presently due and owing or which shall in the future become due and owing to you from the Customer. This liability shall include but not be limited to any and all amounts charged or chargeable to the account of the Customer and any and all existing and future obligations and indebtedness of the Customer, whether acquired by you by assignment, transfer or otherwise, and whether or not such obligations and indebtedness shall be upon orders, commitments or deliveries or shall arise under any other contract or agreement or any renewal, modification, supplement or amendment thereof, or shall be represented by or payable under instruments of indebtedness or otherwise, and whether or not such obligations and indebtedness shall be acquired by you from any concern which is your parent or subsidiary or the co-subsidiary of your parent or for which you may now or in the future act as factor and/or lender, and in addition the undersigned shall be liable to you for attorneys' fees equal to 15% of the unpaid indebtedness and obligations of the Customer to you, if any claim hereunder is referred to an attorney for collection.

"The undersigned hereby waive notice of acceptance hereof and of all notices and demands of any kind to which the undersigned may be entitled, including without limitation all demands of payment on, and notice of nonpayment, protest and dishonor to the undersigned, or the Customer, or . . . as well as notice of orders, sales and deliveries to the Customer, of the amounts and terms thereof and of all defaults, disputes or controversies with the Customer . . . .. The undersigned further waive notice of and hereby consent to any agreement or arrangements whatever with the Customer or any one else, including without limitation agreements and arrangements for payment extension, subordinations, composition, arrangement, discharge or release of the whole or any part of said obligations or of said indebtedness, contracts or agreements or other guarantors, . . . Nothing shall discharge or satisfy the liability of the undersigned hereunder except the full performance and payment of the said obligations and indebtedness with interest. The undersigned shall have no right of subrogation, reimbursement or indemnity whatsoever and no right of recourse to or with respect to any assets or property of the Customer or to any collateral for said debts and obligations of the Customer to you, unless and until all said debts and obligations shall have been paid and performed in full. . . . The undersigned agree that if the Customer or any of the undersigned should at any time become insolvent, . . . or if a proceeding in bankruptcy or any insolvency or reorganization proceeding shall be filed or commenced by, against or in respect of the Customer or any of the undersigned, any and all obligations of the undersigned shall, at your option,

The agreement is by its very terms ". . . an absolute, continuing, unconditional and unlimited guaranty of payment . . .."

Unfortunately, the Briggs rescue plan failed and Grosse Pointe was declared bankrupt in September 1972. At that time, despite some concern over Grosse Pointe's financial position, Crompton-Richmond had, on the basis of the Briggs guaranty, factored approximately $645,040.23 for Crompton-Richmond clients who had been suppliers to Grosse Pointe.

In refusing to pay Crompton-Richmond for the Grosse Pointe liabilities covered by the guaranty agreement, Briggs has presented before both this Court and the trial court two arguments contesting the fact of liability. (i) The $645,040.23 exceeds by far any reasonable amount contemplated by the parties at the execution of the guaranty agreement and, thus, requires his discharge for at least part of this figure. (ii) Crompton-Richmond's failure to observe a duty of good faith and due diligence or commercial reasonableness owed to Briggs as a guarantor necessitates his total discharge from liability under the guaranty. Appended to these defenses, Briggs contends that Crompton-Richmond failed to

sufficiently prove the exact dollar extent of his liability under the guaranty agreement. Lastly, Briggs argues that the Trial Judge's denial of a continuance two days before trial was an abuse of discretion.

## Erie Choices

In evaluating the diversity claims presented, a federal court's normal procedure is to evaluate the *Erie-Klaxon*[5] mandated choice of law decision. However, by calling for application of the law of New York, the Briggs-Crompton-Richmond guaranty agreement relieves us of determining whether the trial court made the appropriate choice of law selection.[6] See *Ideal Structures Corp. v. Levine Huntsville Development Corp.*, 5 Cir., 1968, 396 F.2d 917, 925; Restatement (Second) of Conflicts of Laws §§ 186, 187. On oral argument the applicability of New York law was conceded by Briggs' counsel. Consequently, our review of the substantive liability challenges to the Trial Judge's findings under the clearly erroneous rule, F.R.Civ.P. 52(a), is framed in the context of New York guaranty law.

forthwith become due and payable without notice.

"Your books and records showing the account between you, and/or any concern for which you may act as factor and/or lender, and the Customer shall be admissible in evidence in any action or proceeding, shall be binding upon the undersigned for the purpose of establishing the items therein set forth and shall constitute prima facie proof thereof. This instrument is and shall be construed to be an absolute, continuing, unconditional and unlimited guaranty of payment, and shall continue in full force and effect notwithstanding the death of any of the undersigned, until terminated by the actual receipt by you from the undersigned by registered mail of written notice of termination . . . . .

"The obligation hereunder shall constitute primary and not secondary obligations. This guaranty shall be enforceable before or after proceeding against the Customer or simultaneously therewith, and without resort to any security, and shall be effective regardless of the subsequent incorporation, merger or consolidation of the Customer, or any change in the composition, nature, personnel or location of the Customer, or if any party, firm,

partnership or corporation you may factor . . . . . This instrument . . . shall be governed, construed and interpreted as to validity, enforcement and in all other respects in accordance with the law of the State of New York."

**5.** *Erie Railroad Co. v. Tompkins*, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188; *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477.

**6.** Ga.Code Ann. § 20–209 specifying the lex loci contractus choice of law rule for Georgia courts—to be followed by a federal court sitting in Georgia under *Klaxon*—was repealed by Uniform Commercial Code, Acts 1962, pp. 156, 427, effective January 1, 1974. Under Ga. Code Ann. § 109A–1–105, Georgia allows contracting parties to make their own choice of the applicable state law. For the pre-1974 period, parties have been permitted to select which forum's law governs. See *Barzda v. Quality Courts Motel, Inc.*, 5 Cir., 1967, 386 F.2d 417, 418; cf. *Delta Airlines, Inc. v. McDonnell Douglas Corp.*, N.D.Ga., 1972, 350 F.Supp. 738, aff'd, 5 Cir., 1974, 503 F.2d 239.

### The Unbuckled Facts

■ As formulated by Briggs, the due diligence and reasonable contemplation arguments amount to a request to be discharged from liability based on the concept that a guarantor or surety is a "favorite of the law" deserving protections from changes in the risks assumed by the guarantor.[7] Despite these protests, we find that the District Court's findings of fact are sufficiently supported under the protection of the Buckler and Shield of F.R.Civ.P. 52(a).

■ The record before this Court adequately demonstrates that this creditor-debtor-guarantor situation was one in which a highly educated and skilled businessman with extensive experience in factoring developed and executed a plan to finance Grosse Pointe's expansion program. During this period while acting as Grosse Pointe's chief financial officer, it is an unfathomable assertion that Briggs did not know that the very credit transactions he had contemplated were transpiring. How else would Grosse Pointe achieve its expansionary goal? And as each new purchase was procured from materials suppliers, which were not paid directly by Grosse Pointe, Briggs of all people knew of it. An additionally important point exists. Because the controlling ownership of Grosse Pointe was in his wife's name, Briggs' interest in the company extended further than that of a mere officer.[8] This indirect ownership interest coupled with Briggs' officer status is indicative of the high degree of awareness of Grosse Pointe's financial status.

Briggs occupies the status of one who knew what Grosse Pointe needed to survive and who obtained what was needed—even if later to no avail. In the apt words of the District Court,

"... the way to obtain increased supplies and materials was by execution of the guaranty contract with plaintiff, inasmuch as that guaranty was the vehicle by which Crompton permitted its factoring clients to extend additional credit to Grosse Pointe; such was in fact the result achieved by defendant, who was aware of the implications of signing the guaranty in his efforts directed at turning the company around."

### A Legal Shield

■ Nor may the District Court's findings be set aside because an improper legal standard was utilized or a proper one was misapplied. See, e. g., Theriault v. Silber, 5 Cir. 1977, 547 F.2d 1279, 1280; Costello v. Lipsitz, 5 Cir., 1977, 547 F.2d 1267, 1277 n. 33. Briggs' theory that his obligation under the guaranty far exceeds any reasonable amount contemplated and that Crompton-Richmond violated a duty owed him as a guarantor are belied by the guaranty agreement and are precluded by the relevant law. The guaranty is by its terms a continuing, unconditional one. Such a guaranty is recognized by the New York courts. See Walter E. Heller & Co. v. Cox, 2 Cir., 1972, 486 F.2d 1398, aff'g, S.D.N.Y., 343 F.Supp. 519; Indianapolis Morris Plan Corp. v. Karlen, 1971, 28 N.Y.2d 30, 319 N.Y.S.2d 831, 268 N.E.2d 632; La Mar Hosiery Mills, Inc. v. Credit & Commodity Corp., 1961, 28 Misc.2d 764, 216 N.Y.S.2d 186; M. Lowenstein & Sons v. Roselle Manufacturing Co., 1958, 9 Misc.2d 617, 171 N.Y.S.2d 7, aff'd, 8 A.D.2d 592, 185 N.Y.S.2d 216. Under the guaranty Briggs could and did waive any duty Crompton-Richmond might arguably have owed him. Cf. Walter E. Heller, supra, at 527.[9] As the New York Court stated in an analogous situation

---

**7.** As we indicate below, the trial court found, and we agree, that Briggs knew and undertook all the risks which he now contends require invocation of this principle.

**8.** As part of a termination and division of business interests with a former partner, Grosse Pointe represents one of those businesses which became Briggs'. However, the legal title

to the instruments of ownership—stock certificates—was placed in his wife's name.

**9.** Viewed from the perspective that the purpose of the guaranty was known to Briggs, and that the extent of its usage was known or should have been known to the chief financial officer who developed this financing strategy, the existence of any due diligence or reasonableness

" . . . therefore, he may consent to anything to which the debtor has power to agree, that is, everything except to waive the equity of redemption in advance, and when he does so consent, he is not discharged because the creditor does that to which he has consented and to which lawfully he could consent (57 N.Y. Jur., Suretyship & Guaranty § 202)." *Indianapolis Morris Plan Corp., supra,* 319 N.Y.S.2d at 835, 268 N.E.2d at 635.

■ Briggs agreed to an absolute, unconditional, and *unlimited* guaranty. He obtained what he wanted—credit for Grosse Pointe—knowing that the guaranty possessed a waiver of the duty or duties he now urges as a basis for discharging his liability. Briggs' knowledge and intent added to the law's recognition of such a guaranty necessitates our upholding the trial court's determination that Briggs is liable under the unlimited guaranty for Grosse Pointe's indebtedness. See *Franklin National Bank of Long Island v. Palm Beach Builders, Inc.,* 1961, 28 Misc.2d 986, 221 N.Y. S.2d 133. To hold otherwise, this Court would permit a sophisticated guarantor knowingly to obtain extensions of credit for a debtor of the kind, form, and amount conceived and to subsequently renege on his guaranty of payment. We decline to allow one in Briggs' position to do so. *Cf. Merrill Lynch, Pierce, Fenner & Smith v. Brooks,* 5 Cir., 1977, 548 F.2d 615.

Insofar as Briggs' argument that some New York decisions, in recognizing the obligation of scrupulous fairness between surety-obligor, find breaches of such requirements, the Judge's findings and this total requirement is questionable for one in Briggs' position vis-à-vis the debtor, Grosse Pointe—even absent the waiver provisions which exist in this case. This is particularly true when Briggs' ownership of Grosse Pointe through his wife is coupled with his executive status. *See generally* Restatement of Security § 86, comment c (1941).

10. Instead of the factor bearing the loss on an account receivable, the value of an account receivable in default is collected from or charged back to the seller—here one of Grosse Pointe's suppliers. "Charge back" is the terminology for this procedure.

record negative the existence of any such equitable demands here. His complaint boils down to the assertion that he had to be informed of the conditions he, of all people, knew existed. It is almost to say that Crompton-Richmond had to tell him that he should not incur any further credit obligations for Grosse Pointe because if things did not work out he would owe the factor for the loss. If Crompton-Richmond did not have a duty to tell him those things, it certainly did not have to say "No".

*A Charge Back Made, A Penny Saved?*

Although imposition of liability in a guaranty case generally ends the dispute when the amount owed is easily ascertainable, this case, which properly should have fallen into this category, does not. Because of Crompton-Richmond's cavalier approach to discovery, it denied that it had made any charge backs [10] and denied the existence of records showing charge backs. Subsequently, almost $45,000.00 of such charges was revealed. Added to this factor is the destruction of records sought by Briggs' counsel to cross-check the accuracy of Crompton-Richmond's trial proof on the extent of credit granted Grosse Pointe under the guaranty agreement.

As proof of the amount of credit factored from Grosse Pointe suppliers, Crompton-Richmond introduced into evidence computer printouts of the account supported by testimony of the appropriate Crompton-Richmond personnel. The Trial Judge accepted this evidence and utilized it to determine the extent of Briggs' liability.[11]

11. As his sixth finding of fact, the Trial Judge determined that

"Crompton's records which were admitted in evidence are relied on by Crompton as well as the Court in determining the amount of the Grosse Pointe obligation. The Court finds Grosse Pointe owed Crompton, as of the time this suit was filed and as of this time, the sum of $645,040.23, against which defendant is entitled to a credit as follows:

(a) $11,317.37 interest, which plaintiff waived in open Court because backup documentation for interest was not obtainable.

 The finding of $588,907.40 as Grosse Pointe's liability was not made simply on the basis of evidence adduced at trial. After the trial's conclusion, the Trial Judge ordered further delivery of Crompton-Richmond's records to Briggs' counsel and both sides filed post argument briefs which covered this proof of the amount of liability issue. Thus Briggs had the opportunity, by using the factor's records, trial evidence, and Grosse Pointe's own records, to point out in detail the claimed errors and deficiencies. Only after this additional, post-trial discovery did the District Judge make his findings. The trial court's reliance on these records, properly admitted into evidence as business records, and the post-trial discovery was proper and the evidence sufficiently supported this finding within the standard of F.R.Civ.P. 52(a).[12]

### Nonabusive Denial

Approximately two days prior to trial, information previously denied under oath relating to "charge backs" was revealed to be incorrect. As already indicated, $44,-815.46 was charged back by Crompton-Richmond to one supplier, Delta Finishers, Inc. Because of this discovery only shortly before trial, Briggs' counsel sought a continuance so he could further investigate the existence of other charge backs and verify the amount of liability claimed by Crompton-Richmond. This request was denied by the Trial Judge.

 The grant or denial of a continuance is within the sound discretion of the Trial Judge. *Roberts v. Williams*, 5 Cir., 1971, 456 F.2d 819, 824, *cert. denied*, 404 U.S. 866, 92 S.Ct. 83, 30 L.Ed.2d 110; *Thompson v. Fleming*, 5 Cir., 1968, 402 F.2d 266, 267; Wright & Miller, Federal Practice

& Procedure: Civil § 2352. Although we deplore Crompton-Richmond's attitude toward requests for information made during discovery and the filing by its counsel of statements under oath that turned out to be untrue, we find no abuse of discretion arising from the denial of Briggs' continuance motion. This is particularly true in light of the post-trial discovery and briefing ordered by the Trial Judge which fully ventilated Briggs' contentions.

AFFIRMED.

---

(b) The sum of $44,815.46, the amount charged back by plaintiff to Delta Finishers, Inc., a Grosse Pointe supplier.

Thus, the final net amount of the obligation is $588,907.40.

**12.** No question exists about the propriety of the admission of this evidence into the record. It was properly admitted. See *Hanley v. United States*, 5 Cir., 1969, 416 F.2d 1160, 1167, n. 14; *see generally* F.R.Evid. 803(6); 28 U.S.C.A.

§ 1732. Although Briggs does not contest the admission of this evidence, his attack is essentially one arguing its inaccuracy and incompleteness. As indicated in *Hanley, supra*, this is an assault on its weight, not on its admissibility. Of course, the weight accorded to such records is within the domain of the trier of fact—in this case the Trial Judge. See *Travelers Indemnity Co. v. Peacock Constr. Co.*, 5 Cir., 1970, 423 F.2d 1153, 1157.