**UNITED STATES of America,**
**Appellee,**

v.

**Julius SALSBURY, Appellant.**

**Nos. 14809, 14810.**

United States Court of Appeals,
Fourth Circuit.

Argued July 24, 1970.

Decided Aug. 14, 1970.

## I.

For many years, Salsbury, a night club operator, financed large scale gambling operations in violation of Maryland law. His activities ran the gamut from soliciting bets on sporting events to backing numbers writers. Frequently bettors paid their gambling debts to bookmakers by checks or money orders which the bookmakers used along with cash to settle their accounts with Salsbury. When 15 or 20 of these checks or money orders had accumulated, Salsbury, or one of his employees, delivered them to a drug store that operated a check cashing service. The druggist identified all checks received from Salsbury's night club by the mark, "CL," with the understanding that Salsbury would be responsible for any that were dishonored. The druggist, in turn, cashed the checks and money orders at a bank and notified Salsbury that he or one of his employees could pick up the cash at the drug store. Some of the checks and money orders cashed in this way were drawn on out-of-state banks, and the transmission of these instruments in the mail to the drawee banks in the clearing process is the basis for the government's invocation of the Travel Act.

Arnold M. Weiner, Baltimore, Md. (Isaac M. Neuberger, Baltimore, Md., on brief), for appellant.

Paul R. Kramer and J. Frederick Motz, Asst. U. S. Attys. (George Beall, U. S. Atty. for the District of Maryland, on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and WINTER and BUTZNER, Circuit Judges.

BUTZNER, Circuit Judge:

Julius Salsbury appeals his conviction of seven charges of using, or causing others to use, the mail in violation of the Travel Act, 18 U.S.C. (1964), as amended, (Supp. I, 1965).[1] Finding no error, we affirm.

## II.

In Kann v. United States, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944), the Supreme Court held that use of the mails to negotiate a check subsequent to a completely executed fraudulent scheme did not constitute a violation of the Mail Fraud Act, 18 U.S.C. § 1341 (1964).

---

1. The relevant part of Section 1952 provides:

"(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

"(b) As used in this section 'unlawful activity' means (1) any business enterprise involving gambling * * * in violation of the laws of the State in which they are committed * * *."

The Court subsequently extended *Kann* to a series of fraudulent acts in Parr v. United States, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960). Salsbury contends that the *Kann-Parr* rationale should be applied to § 1952, but he overlooks basic differences in the language and purposes of the two statutes. The gravamen of mail fraud is the misuse of a federal instrumentality in the execution of a fraud. On the other hand, the legislative history of § 1952 indicates that interstate facilities, including the mails, are jurisdictional means through which federal officers can assist local law enforcement. H.R.Rep.No.966, 87th Cong. 1st Sess. (1961), U.S.Code Cong. & Admin.News, p. 2664. *Kann* was similarly distinguished in United States v. Sheridan, 329 U.S. 379, 387, 67 S.Ct. 332, 336, 91 L.Ed. 359 (1946), construing the National Stolen Property Act as "part of a scheme of federal-state cooperation in apprehending and punishing criminals, while [the Mail Fraud Act] deals only with a distinctly federal crime."

■■ Salsbury asserts that the cashing of an out-of-state check does not establish use of a "facility in interstate or foreign commerce" within the meaning of § 1952. In support, he cites portions of the legislative history that indicate an intention to exclude from the proscriptions of the statute legitimate banks and businesses that in the ordinary course of trade clear through the mail checks that had been part of an illegal transaction. However, nowhere is it intimated that a gambler can with impunity avail himself of interstate mails for clearing checks to finance illegal wagering, even though the bank which actually mailed the checks committed no crime. Indeed, the express legislative purpose is just the opposite: "denying interstate facilities to individuals engaged in illegal * * * enterprises."

H.R.Rep.No.966, 87th Cong., 1st Sess. (1961); United States v. Wechsler, 392 F.2d 344, 347 (4th Cir.), cert. denied, 392 U.S. 932, 88 S.Ct. 2283, 20 L.Ed.2d 1389 (1968). Nor does it matter that the use of interstate facilities was tangential to the major part of Salsbury's gambling operation, since § 1952 requires only that the use "carry on or facilitate the carrying on" of the illicit enterprise. This language is much broader than that of the Mail Fraud Act and therefore transcends the limitation in *Kann* that the mails be used "in execution" of the scheme. United States v. Gerhart, 275 F.Supp. 443 (S.D.W.Va. 1967).

■ The fact that Salsbury received cash for the checks before they cleared the out-of-state banks does not insulate him from the interstate aspect of the transactions. As part of their working arrangement, Salsbury agreed to reimburse the druggist for any checks that bounced. Salsbury thus retained a direct financial interest in the checks until they had cleared the out-of-state banks. This method of clearing checks was part and parcel of his gambling operation, the last step which "facilitated the carrying on" of Salsbury's continuing gambling network. It is of no significance that the druggist rather than Salsbury actually cashed the checks at a bank and started the clearing process that used the mails, because Salsbury initiated the transactions and guaranteed payment in the event of dishonor.

### III.

■ Salsbury also assigns as error the trial court's charge that he could be convicted if "he knew, or could reasonably have been expected to know, that some of those checks or instruments were drawn on banks or institutions not located in the State of Maryland." [2] He

2. The text of the charge concerning knowledge as an element of the crime is:

"Now let me come to the specifics of what is and is not requisite knowledge, taking into account the requirements and the provisions of Section 1952 and Section 2.

The Government is not required to prove that a defendant knew that he was committing a federal offense, or that he knew that the particular check

contends that this instruction creates an improper test for determining whether he had knowledge of the use of interstate facilities, and that he was entitled to a much stricter standard of proof—that is, that he agreed to a scheme in which the likelihood of cashing an interstate check was known to be great. He relies primarily on Twitchell v. United States, 313 F.2d 425, 429 (9th Cir. 1963), vacated and remanded sub nom. Rogers v. United States, 376 U.S. 188, 84 S.Ct. 637, 11 L.Ed.2d 603 (1964), where the court, referring to a sheriff who was charged with conspiracy to violate the Mann Act by receiving protection money, said the evidence must show either:

"1. he directly agreed to the illegal interstate transportation, or directly agreed to a scheme which could not be consummated without illegal interstate transportation, or directly agreed to a scheme in which it was known that the likelihood of illegal interstate transportation was *great* * * * or

2. he evidenced his indirect agreement by substantial participation in the scheme with actual knowledge of the proposed, or completed, illegal interstate transportation."

But Salsbury's reliance on *Twitchell* is misplaced, for there the defendant's involvement in the conspiracy was peripheral, a fact which caused the court to caution, "The degree of knowledge required of the interstate aspect thus increases as the defendant's connection with the core agreement becomes more tenuous." 313 F.2d at 429. See also United States v. Corallo, 413 F.2d 1306, 1324 (2d Cir.), cert. denied, 396 U.S. 958, 90 S.Ct. 431, 24 L.Ed.2d 422 (1969).

Salsbury was not a peripheral figure in a gambling ring. On the contrary, he was at the center of a far-flung illegal operation. The jury could aptly test the extent of the knowledge he acquired from this vantage point in terms of whether "he knew or could reasonably have been expected to know" of the interstate character of the checks used to pay gambling debts.[3] Certainly if Salsbury knew that his associates were using out-of-state checks to settle with him, his knowledge was sufficient to

---

was drawn on a non-Maryland bank or institution. However, in this case, you may find a defendant acted knowingly, wilfully and unlawfully only if you find beyond a reasonable doubt each of the following:

One: That the defendant knew he was involved in a gambling enterprise.

Two: That he was receiving or causing others to receive over a substantial period of time many checks and instruments such as money orders.

Three: That a natural consequence of that involvement was the depositing or cashing of a substantial number of checks and instruments.

Four: That he knew, or could reasonably have been expected to know, that some of those checks or instruments were drawn on banks or institutions not located in the State of Maryland.

Five: That in connection with the particular count of the indictment involved, he received or caused to be received the check or checks or instrument or instruments referred to in that count.

Six: That he did some act or caused one or more persons to do some act in connection with the handling of the check or instrument, or checks or instruments, leading to its or their ultimate passage through interstate channels."

In United States v. Hanon, 428 F.2d 101 (8th Cir. 1970), the court approved the trial judge's refusal to grant instructions making knowledge and intent with respect to the use of interstate facilities essential elements of the offense. However, since Salsbury was tried on the theory that knowledge of the interstate use was essential, we need not consider whether the holding in *Hanon* should be applied.

3. The genesis of the phrase appears to be United States v. Barnes, 383 F.2d 287, 292 (6th Cir. 1967), cert. denied, 389 U.S. 1040, 88 S.Ct. 780, 19 L.Ed.2d 831 (1968), where the court said lack of knowledge of the Travel Act would not "excuse copartners who reasonably could be expected to know of the commission of the forbidden acts by their copartner."

convict him. And if he reasonably could have been expected to know of these checks, he could not with impunity avert his gaze to avoid actual knowledge. Cf. United States v. Zambito, 315 F.2d 266, 268 (4th Cir.), cert. denied, 373 U.S. 924, 83 S.Ct. 1524, 10 L.Ed.2d 423 (1963).

## IV.

Salsbury also contends that even under the standards adopted by the district judge for determining knowledge, the evidence is insufficient to show that he knowingly used interstate facilities with intent to promote a gambling enterprise. In support of this argument he points out that the evidence disclosed that he expressly warned his associates of the danger of engaging in out-of-state transactions and directed them to have no out-of-state dealings. He also emphasizes that the evidence showed that only a few out-of-state checks or money orders were linked by the government to his gambling transactions and that there was no proof that he personally handled or saw any of them.

Salsbury relies on several cases to show by analogy that the evidence was insufficient to support his conviction. In United States v. Barnes, 383 F.2d 287 (6th Cir. 1967), cert. denied, 389 U.S. 1040, 88 S.Ct. 780 (1968), three partners in a gambling establishment were convicted of violating the Travel Act. On appeal the convictions of two were set aside because a majority of the court considered the evidence insufficient to show that they had knowledge that the managing partner cashed checks drawn on out-of-state banks and made out-of-state purchases of chips and dice. The cases, however, are distinguishable. Here, the evidence disclosed that Salsbury alone financed the bookmakers who settled their accounts with out-of-state checks. He was the sole manager of his enterprise and his position more nearly approaches that of the managing partner who was convicted in *Barnes* than the other partners who were acquitted. The inferences to be drawn from Salsbury's dominant position similarly serve to distinguish the other cases on which he relies.[4]

■ Viewing the evidence in the light most favorable to the government, we conclude that there was sufficient evidence to support Salsbury's conviction. From the evidence, the jury could have found that bookmakers backed by Salsbury received the out-of-state instruments mentioned in the indictments in payment of gambling debts; that the bookmakers used the out-of-state checks along with cash and in-state checks to settle their financial accounts with Salsbury; and that Salsbury caused the checks to be cashed at the drug store with the understanding that if they were dishonored by the out-of-state banks on which they were drawn, he would cover the loss.

■■ Further, the evidence was sufficient for the jury to find that Salsbury knew, or could reasonably have been expected to know, that some of the checks or money orders that came into his organization were drawn on out-of-state banks. Salsbury knew the danger of interstate transactions, for he warned his associates not to engage in them lest they violate federal law. But the jury was entitled to infer that one who engages with others in an illegal enterprise cannot reasonably assume that a mere warning will assure that violators of state law will comply with federal law. Salsbury, fearing that out-of-state checks might be presented to pay gambling debts, could not, as a matter of law, insulate himself from prosecution by leaving the acceptance of the checks and the details of cashing them to underlings, while at the same time he facilitated their cashing by his guaranty.

4. South v. United States, 412 F.2d 697 (5th Cir. 1969); Grimes v. United States, 379 F.2d 791 (5th Cir.), cert. denied, 389 U.S. 846, 88 S.Ct. 104, 19 L.Ed. 2d 113 (1967); United States v. Honeycutt, 311 F.2d 660 (4th Cir. 1962).

In order to constitute an offense under § 1952, the interstate facility must have been used with the intent to carry on or facilitate the carrying on of an unlawful activity. Under familiar principles, a jury may infer the requisite intent from the defendant's course of conduct. United States v. Compton, 355 F.2d 872, 874 (6th Cir.), cert. denied, 384 U.S. 951, 86 S.Ct. 1571, 16 L. Ed.2d 548 (1966); United States v. Harris, 275 F.Supp. 161 (E.D.Va.1967), aff'd per curiam, 399 F.2d 687 (4th Cir. 1968).

The issues of Salsbury's knowledge and intent presented questions of fact for the jury, and the trial judge properly refused to disturb its verdict. Hanley v. United States, 416 F.2d 1160, 1163 (5th Cir. 1969).

V.

From 1962 until 1965, the government illegally tapped Salsbury's phone, and he contends that the government did not establish that its case was free from this taint. In post-trial proceedings on the wiretap issue, Salsbury discovered that the government had failed to reveal information acquired in interviews of some government witnesses by federal investigators. This he claims entitles him to a new trial under the principles stated in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Barbee v. Warden, 331 F.2d 842 (4th Cir. 1964).

After extensive hearings the district judge denied Salsbury's motions. We affirm his rulings for the reasons fully stated in his oral opinions. On the *Brady* issue, the district judge found that although the government had not revealed the interrogation of some government witnesses, the government neither intentionally nor negligently withheld this information, and that moreover, its inadvertent non-disclosure had not prejudiced Salsbury. Cf. United States v. Keogh, 391 F.2d 138, 147 (2d Cir. 1968). The district judge conduct-

ed adversary proceedings on the wiretap issue in conformity with Alderman v. United States, 394 U.S. 165, 180, 89 S. Ct. 961, 22 L.Ed.2d 176 (1969). His finding that none of the government's evidence was the fruit of the illegal surveillance is amply supported by the record.

The judgment is affirmed.