UNITED STATES of America, Appellee,

v.

Stephen HATHAWAY,
Defendant-Appellant.

UNITED STATES of America, Appellee,

v.

Howard BAPTISTA, Defendant-Appellant.

Nos. 75–1352, 75–1353.

United States Court of Appeals,
First Circuit.

Argued Dec. 2, 1975.

Decided March 24, 1976.

389

C. Thomas Zinni and Morris M. Goldings, Boston, Mass., with whom Corinne Gehr, and Alan Rindler, Boston, Mass. (of counsel), were on brief, for appellants.

Steven J. Brooks, Asst. U. S. Atty., with whom James N. Gabriel, U. S. Atty., Edward J. Lee, Kevin J. O'Dea, and Alan D. Rose, Asst. U. S. Attys., Boston, Mass., were on brief, for appellee.

Before COFFIN, Chief Judge, and McENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Defendants Hathaway and Baptista were charged in a six-count indictment with substantive and conspiracy violations of 18 U.S.C. § 1951, the Hobbs Act, and 18 U.S.C. § 1952, the Travel Act. Both were convicted of all charges after an eight-day jury trial.

The Government contended that defendants extorted money from Meridian Engineering, Inc. (Meridian), in return for the

award of two contracts by the New Bedford, Massachusetts, Redevelopment Authority (Authority), of which Baptista was Executive Director. Meridian was a design, engineering, and construction management firm with its principal office in Philadelphia, Pennsylvania. In the summer of 1971, the Authority awarded Meridian a no-bid contract for the West End Urban Redevelopment Project (WEP), and in the summer of 1972 it awarded Meridian a contract for the Neighborhood Development Project (NDP). Both of those contracts were allegedly arranged at meetings between Baptista and Thomas A. Graham, the President of Meridian.

Graham, testifying under a grant of immunity, 18 U.S.C. § 6003, was the Government's chief witness. He testified that Meridian first came in contact with the Authority in early 1971, when Meridian worked on WEP as a subcontractor for the project consultant, Lucas & Edwards, Inc., a New York planning firm. Meridian became interested in doing its own engineering and design work for the Authority as a "follow-on" to the planning services performed by Lucas & Edwards, Inc. Graham therefore met with William Lucas of Lucas & Edwards, Inc., to discuss a WEP contract for Meridian. From Lucas, Graham gained the impression that to procure a WEP contract for Meridian, he would have to pay a sum of money to Baptista, whom he had never met. A meeting of Graham, Lucas and Baptista was arranged, and Graham and Lucas flew to New Bedford.

At the meeting, the topics of discussion were the WEP contract and the payment of money by Meridian to Baptista for that contract. Graham testified that he proposed the sum of $25,000, slightly in excess of 10% of the contract amount, and that Baptista agreed to it. Prior to the meeting, Graham had drawn up a schedule for the payments, which would number four, laying out four payment dates, the amounts to be paid to Baptista on each date, and a Meridian project to which the amounts would be charged. Baptista gave Graham four blank

invoices, bearing Hathaway's letterhead, for the purpose of charging and covering up these payments.

During the meeting, Baptista mentioned another Authority project, the NDP. He told Graham that the contract would be coming up in the following year and that he was interested in Meridian doing a good job on WEP so that it could be considered for the later project.

Graham testified that he agreed to make the payments because otherwise Meridian would not have received the WEP contract.

After returning to Philadelphia, Graham caused the blank Hathaway invoices [1] to be filled in with Meridian's address, a statement of work "performed", i. e., labor, materials, or equipment that Hathaway allegedly furnished, and the amount due. The amounts were charged against other Meridian jobs. The project managers for each of those jobs testified that no Stephen Hathaway supplied any materials or did any work on those jobs. The invoices and the schedule which Graham had drawn up were given to Meridian's comptroller, who placed them in a cash flow file with instructions to mail the checks on the dates noted and to file the entries against the invoices. In all, four checks were made out to Stephen Hathaway pursuant to the invoices and were signed by Carl Sinibaldi, the head of Meridian's accounting department and Graham's brother-in-law. The company practice was to enclose copies of invoices with all checks. It was testified that the checks were then sent to 59 Raymond Street in Manchester, Massachusetts, the address on the invoices, although Margaret R. Hathaway, who resided at that address during 1971 and 1972, herself testified that Stephen Hathaway had left that residence permanently in 1964, and that no mail had come for him there since 1970.

Graham testified that he saw Baptista again in July, 1971, at Baptista's office, and asked if the first check had been received and if the procedure being used was satis-

1. The original invoices were not offered at trial as they could not be located in Meridian's files.

factory. Baptista stated that it was and that he had received the first payment.

Work was begun on the project even before the contract was actually signed. Graham testified that although it was very rare to begin so early, Meridian went ahead as he had received a letter of assurance from Baptista that Meridian would be awarded the contract at the next board meeting. The Authority did in fact award the contract to Meridian at that board meeting in August, 1971.

The following summer, in early August, 1972, Graham again met with Baptista at his Authority office in New Bedford to discuss the NDP contract. This meeting was arranged by either Graham or one of his staff, not by Baptista. Graham testified that before leaving Philadelphia he prepared a schedule similar to the one used in 1971.[2] At the meeting, according to Graham's testimony, he told Baptista that he had learned from Caesar Wheeler, Meridian's WEP project manager, that Meridian was not going to receive the NDP contract. Baptista replied that he was under local pressure to award the contract to a local firm. Graham suggested that they work out an arrangement as before and offered $5,000, using the same procedure. Baptista replied that he thought he could swing the contract for Meridian, and that $5,000 would be satisfactory. Graham asked for another set of blank invoices, and Baptista gave him some more with Hathaway's letterhead. Graham showed Baptista the schedule he had prepared, listing four payments totalling $5,000 and the projects to which the amounts would be charged. Graham testified that he again agreed to pay the money since he believed that Meridian would not receive the contract otherwise. The Authority approved Meridian for the NDP engineering work in September, 1972.

As before these invoices were filled out and given to Meridian's accounting department to pay. Again, the managers of the projects to which the charges were billed testified that Stephen Hathaway was in no way involved. Checks were made payable to Stephen Hathaway and sent to the address on the invoices, Box 121, West Roxbury Post Office, West Roxbury, Massachusetts. The first check was sent to that address but was lost.[3] A replacement check and the remaining three checks were sent to the old Manchester address.

The records of the West Roxbury post office gave no indication of Box 121 ever having been assigned to Stephen Hathaway since 1969; nor was there any notation that any mail had been forwarded to Stephen Hathaway since 1969. However, the postal clerk in charge of box mail at the post office between 1970 and 1974 testified that he was personally familiar with the name Stephen Hathaway, although not the person, and recollected that Hathaway had been a box holder of Box 121. He also recalled having forwarded Hathaway's mail to South Road in Deerfield, New Hampshire, although the last time had been four or five years earlier. The postmaster of Deerfield testified that she knew Hathaway, that he had received mail there within the past six years, and that she had forwarded his mail to Biddeford, Maine, where Hathaway was listed as a postal patron.

However uncertain the chain of mail delivery, it was clearly established that all eight Meridian checks bore a single endorsement, the name Stephen Hathaway, and that all were cashed at the Southeastern Bank in New Bedford. Hathaway had no account at that bank but he was known to the bank employees since he often cashed checks there, probably more than forty since 1969. The bank allowed non-depositors to transact business there if they were first introduced by someone known to the bank. It was brought out that Hathaway had originally been introduced to Robert LeVesque, Senior Vice-President and Con-

2. Graham testified about this schedule on five separate occasions. Three times he said that he prepared it prior to his trip, and twice, upon the suggestion of an Internal Revenue Service agent, that he could not have prepared it before.

3. No explanation was offered at trial as to how Meridian learned the check had been lost.

troller of the bank, by Baptista, a director and officer. LeVesque testified that Hathaway's normal routine when cashing checks there was to have Jackie McDonald, Baptista's secretary, first call ahead and tell the bank that he was coming over and to have the amount of the check ready for him. Hathaway cashed checks there ranging anywhere from $200 or $300 to $19,000 or $20,000. Ms. McDonald testified that she did not do this only for Hathaway, but that she communicated with the bank quite often on behalf of various contractors and tenants of the Authority who were also non-depositors there.

Francine Tavares, the head teller, testified that she had personally cashed two of the Meridian checks, identifying her stamp on them. She also identified Hathaway in the courtroom. She recalled on one occasion seeing Hathaway speaking with Baptista in the bank lobby, and she saw Baptista there a number of times.

Hathaway in fact never performed any work for the Authority. There was no evidence of personal contact between Graham and Hathaway, and Graham testified he was not even certain that Hathaway existed until the investigation of the case was under way.

## I

Defendants first raise a number of objections to their Hobbs Act convictions. The Hobbs Act, 18 U.S.C. § 1951, provides in pertinent part:

"(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

(b) As used in this section—

. . . . .

(2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

(3) The term 'commerce' means . . . all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction."

Defendants were charged under this section with willfully attempting to obstruct, delay and affect interstate commerce and the movement of materials, equipment, services and supplies in such commerce by extortion, induced both by the wrongful use of fear of economic loss and under the color of official right.[4] Their present challenges have to do with the meaning of "extortion", the meaning of "commerce", and the sufficiency of the evidence on various elements of the Government's case.

■ Defendants contend that the district court incorrectly instructed the jury as to the meaning of extortion under the Hobbs

---

4. Count III reads in pertinent part,

"From on or about June, 1971 to on or about November, 1971 . . . [defendants] did knowingly, willfully and unlawfully attempt to obstruct, delay and affect interstate commerce and the movement of materials, equipment, services and supplies in such commerce by extortion, in that the defendants . . . obtained a sum of money in the amount of approximately Twenty-five Thousand Dollars ($25,000) from Thomas A. Graham and Meridian Engineering, Inc., induced both by the wrongful use of fear and under the color of official right, in that the defendants, acting in concert, . . . did demand, solicit and obtain from Thomas A. Graham and Meridian Engineering, Inc. money in the amount of approximately Twenty-five Thousand Dollars ($25,000), which said sum of money was paid to prevent economic loss due to the fact that Thomas A. Graham and Meridian Engineering, Inc. could not obtain, without paying said sum of money, engineering and planning contracts with the said New Bedford Redevelopment Authority."

The other Hobbs Act count, Count V, relating to the alleged extortion of $5,000 for a contract in 1972, was similarly worded.

Act,[5] quoting as follows from the court's charge:

"The term 'extortion' means obtaining of property from another with his consent induced under color of official right. It is an alternative method. It is the second string to the Government's bow. The term extortion under the statute includes the obtaining from another induced under color of official right. The government is entitled to prove the element of extortion in the crimes charged in Counts 3 and 5 [Hobbs Act violations] either by proving extortion of money induced by fear of economic loss, or extortion of money induced under color of official right. The government is not required to prove both by fear and under the color of official right."

Defendants argue that actual or threatened force, violence or fear are necessary elements of extortion in all Hobbs Act cases, even those involving the obtaining of property under color of official right. They rely upon what they say is the traditional distinction between bribery and extortion, bribery involving voluntary payment by the victim, and extortion payment under duress. *United States v. Addonizio*, 451 F.2d 49, 72 (3d Cir.), *cert. denied*, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972).

■ However, we find no reason to part company with the other circuits which have considered this question, all of which have read the statute as did the court below. *United States v. Trotta*, 525 F.2d 1096, 1100 (2d Cir. 1975), *petition for cert. filed*, 44 U.S.L.W. 3505 (U.S. Jan. 21, 1976) (No. 75–1032); *United States v. Braasch*, 505 F.2d 139, 151 & n.8 (7th Cir. 1974) (Clark, J.), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975); *United States v. Kenny*, 462 F.2d 1205 (3d Cir.), *cert. denied*, 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972); *cf. United States v. Price*, 507 F.2d 1349 (4th Cir. 1974). The statute is clearly phrased in the disjunctive: "The term 'extortion' means the obtaining

of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, *or* under color of official right." § 1951(b)(2) [Emphasis supplied]. Further, a disjunctive reading comports with the historical development of the crime of extortion. The "under color of official right" language reflects the common law definition of extortion, which could be committed only by a public official's corrupt taking of a fee under color of his office and did not require proof of threat, fear, or duress. *United States v. Staszcuk*, 517 F.2d 53 (7th Cir. 1974) (en banc) (Stevens, J.) (adopting by reference the panel opinion at 502 F.2d 875, 878 on this point), *cert. denied*, 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56, 44 U.S.L.W. 3202 (1975); *United States v. Crowley*, 504 F.2d 992, 994–95 & n.5 (7th Cir. 1974); *United States v. Kenny, supra*, 462 F.2d at 1229, *citing United States v. Nardello*, 393 U.S. 286, 289, 89 S.Ct. 534, 536, 21 L.Ed.2d 487, 490 (1969); W. LaFave & A. Scott, Criminal Law, § 95 at 704 (1972). The misuse of public office is said to supply the element of coercion. *United States v. Mazzei*, 521 F.2d 639, 644–45 (3d Cir. 1973) (en banc), *cert. denied*, 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385, 44 U.S.L.W. 3344 (1975). Threats, fear and duress became express elements only when the crime was later broadened to include actions by private individuals, who had no official power to wield over their victims. *United States v. Crowley, supra; United States v. Kenny, supra*. We thus find no error in the instruction given, permitting conviction upon a finding either that money was obtained under color of official right or else that its payment was induced by fear of economic loss, both theories having been charged in the indictment.

■ Respecting the "official right" theory, defendants assert that the charge erroneously allowed the mere passive receipt of money to establish a violation.

**5.** In construing the Hobbs Act, we have in mind the Supreme Court's admonition that Congress, in enacting the statute, intended to "use all the constitutional power [it] has to punish interference with interstate commerce by extortion, robbery or physical violence." *Stirone v. United States*, 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252, 255 (1960).

This, they contend, would be bribery, not extortion. We agree, however, with recent federal decisions indicating that bribery and extortion as used in the Hobbs Act are not mutually exclusive. *United States v. Braasch, supra*, 505 F.2d at 151 & n.7; *United States v. Kahn*, 472 F.2d 272, 278 (2d Cir.), *cert. denied*, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973). Here, moreover, the court charged that the inducement had to come from the official:

> "[W]here the initiative and the inducement for the payment comes from or is on the part of the public official, and not the voluntary payment on the part of the so-called victim, it is this wrongful use of the office clothed with power of authority that converts official action into extortion."

This instruction clearly precluded conviction based upon the passive receipt of money. Indeed, to the extent it suggested that the initiative had to come *solely* from the official, it may have been even more favorable to the defense than was strictly necessary.

■ Defendants further complain that the court erroneously charged that "as a matter of law" Baptista was a public official for purposes of § 1951. They would have us infer this from the court's refusal of their request for an instruction requiring proof that Baptista had the "direct administrative or operating authority to approve, disapprove or otherwise direct the action of the New Bedford Redevelopment Authority as to whether it would award each contract to Meridian." The court instead charged that if Baptista "used the office of Executive Director of New Bedford Redevelopment Authority to initiate and induce payments", the inducement to part with money was extortion.

We find no error. "Under color of official right" includes the misuse of office to induce payments not due. The relevant question was whether Baptista imparted and exploited a reasonable belief that he had effective influence over the award of Authority contracts. *United States v. Meyers*, 529 F.2d 1033 at 1037–1038 (7th Cir. 1976); *United States v. Mazzei, supra*, 521

F.2d at 643; *see United States v. Staszcuk, supra*, 502 F.2d at 878. There was considerable evidence that as Executive Director Baptista was, and appeared, able to influence the awarding of contracts. To be sure, as defendants point out, Baptista's statutory power was subordinate to that of the Authority's board, M.G.L. c. 121B, and various members testified that the board had not always in the past ratified Baptista's recommendations. Still, Graham testified that he went to Baptista because Lucas led him to believe that to obtain a contract he would have to pay Baptista. Baptista thereafter agreed, for a consideration, to furnish a contract, and Meridian in fact received a contract. These and subsequent events bore witness to Baptista's power. Moreover, in the summer of 1971, Baptista was able to give Graham advance assurance that the board would approve Meridian at its next meeting. And in 1972, Baptista told Graham that he was under local pressure to award the NDP contract to a local firm, implying that the award was his own decision. Thereafter he redirected the contract to Meridian. The evidence was thus more than adequate that Baptista could influence awards, and that he exploited this ability.

■ Besides challenging the "official right" aspect of the extortion charged, defendants assert error with respect to the alternative theory set forth in the indictment; namely, extortion by fear of economic loss. As well as "under color of official right", the Hobbs Act encompasses extortion through actual or threatened violence, threats, or fear, 18 U.S.C. § 1951(b)(2). *See United States v. Addonizio, supra.* "Fear" includes fear of economic loss. *Id.* at 72; *Bianchi v. United States*, 219 F.2d 182, 189 (8th Cir.), *cert. denied*, 349 U.S. 915, 75 S.Ct. 604, 99 L.Ed. 1249 (1955). The indictment charges defendants with soliciting money, and Graham and Meridian with paying it, in order "to prevent economic loss", described as an inability to obtain contracts with the Authority. Defendants contend that Graham was as a matter of law incapable of being extorted through fear of economic

loss, both because he was no stranger to the bribing of officials and because Meridian had no prior entitlement to the two no-bid contracts and thus no "economic loss" to fear.

Graham undoubtedly had a striking and, one might say, colorful history of paying off officials. He testified to bribing the majority leader of the Pennsylvania House, the treasurer of the State of New Jersey, and the mayor of Lancaster, Pennsylvania. These payments were entered on Meridian's books as administrative travel expenses. He also admitted to giving the chairman of the Republican Party of Bucks County, Pennsylvania, an interest-free loan which was partly forgiven, and to employing an attorney who performed little by way of legal services, but apparently was adept at ensuring the continuation of state jobs in New Jersey. In August, 1972, on the day before his meeting with Baptista, Graham met with one Jerry Sands in New York, whom Graham used on two or three occasions as a "money laundry" to take money from Meridian for his own personal use, by authorizing payment on fake invoices. On all this evidence, defendants urge, Graham was unextortable as a matter of law.

■ However, as we have said, bribery and extortion are not mutually exclusive. The court cautioned the jury that voluntary payments by Graham would not amount to extortion; and viewing the evidence in a light most favorable to the Government, there is sufficient evidence for the jury to have found that Graham paid Baptista involuntarily in the sense that he otherwise feared Meridian's preclusion from business with the Authority. Graham's overtures to Baptista followed upon Lucas' advice that to procure a contract he would have to pay Baptista. Since Lucas & Edwards, Inc., was already performing work for the Authority (and since, indeed, Lucas even accompanied him to the first meeting with

Baptista), Graham had every reason to accept that Baptista was dealing in this manner. It was Graham's testimony that he agreed to the 1971 payments because otherwise Meridian would not have received the WEP contract. The extortionate aspect is even clearer with respect to the second contract. Baptista dangled the NDP contract before Graham at their first meeting in 1971. Thereafter he told Graham that he was under pressure to engage a local firm. Graham responded by agreeing to pay, and Baptista then arranged the matter in Meridian's favor. The jury could believe that Baptista manipulated the situation to play upon Graham's fears of missing out on the contract. To be sure, on both occasions, Graham himself may have first brought up the subject of payments. But the jury could find that the impetus came from a reasonable apprehension that, without paying, Meridian would not be considered by the Authority. Baptista's exploitation of such a fear amounted to extortion notwithstanding Graham's readiness and even eagerness to play the game. *See United States v. Kahn, supra,* 472 F.2d at 277–78.

■ Defendants also argue that, since Meridian was seeking a no-bid personal service contract, it had no existing property right within the meaning of the Hobbs Act. Graham and Meridian, they say, would not suffer or fear an economic loss if they failed to procure such a contract. However, given the broad purpose of the Hobbs Act, the argument is hypertechnical. The emphasis in extortion is on the coercion by the defendants, *cf. United States v. Braasch, supra,* and the resulting fear created in the victim's mind. Clearly some kind of "property rights" would have to be involved, or otherwise there would be no motivation for the victim's acquiescence in the demands of the defendant. But a narrow perception of property rights or economic loss is misdirected.[6]

---

6. The Hobbs Act itself refers only to fear, without specific mention of fear of economic loss, although courts have held that the latter is within the kinds of fear contemplated by the Act. *See Bianchi v. United States,* 219 F.2d 182, 188–89 (8th Cir.), *cert. denied,* 349 U.S. 915, 75 S.Ct. 604, 99 L.Ed. 1249 (1955). The proper focus, therefore, is whether the victim's interest, economic or otherwise, was sufficient to give rise to fear. Collateral inquiry into the

■ Defendants refer to early Hobbs Act cases, where rights or privileges already the victims' were threatened by unwarranted interference,[7] and cases where contractors already engaged in public construction projects have been compelled to make payments to avoid losing their contracts, *United States v. Kenny, supra; United States v. Addonizio, supra.* But none of those cases expressly rule out the sort of fear alleged here. In *United States v. Tropiano*, 418 F.2d 1069 (2d Cir. 1969), *cert. denied*, 397 U.S. 1021, 90 S.Ct. 1258, 25 L.Ed.2d 530 (1970), the court said,

> "The concept of property under the Hobbs Act . . . includes, in a broad sense, any valuable right considered as a source or element of wealth . . . . The right to pursue a lawful business including the solicitation of customers necessary to the conduct of such business has long been recognized as a property right within the protection of the Fifth and Fourteenth Amendments of the Constitution. [The] right to solicit accounts . . . constituted property within the Hobbs Act definition."

418 F.2d at 1075–76 (citations omitted). Similarly, we think the possibility of lost business opportunities can create a fear of economic loss. *Contra United States v. Kubacki*, 237 F.Supp. 638, 640–42 (E.D.Pa. 1965).

We turn next to defendants' claims of error with respect to the Hobbs Act requirement that the extortion affect commerce. The indictment charged attempted obstruction, delay, and effect upon interstate commerce and the movement of materials, equipment, services and supplies therein.

■ Defendants argue that the judge erred in instructing the jury that only a slight or minimal impact on interstate commerce need be shown and in rejecting their requested instruction that the depletion of Meridian's assets had to adversely affect interstate commerce.[8] However, it has been consistently held that the alleged extortion need only have a *de minimis* effect on interstate commerce. *United States v. Shackelford*, 494 F.2d 67, 75 (9th Cir.), *cert. denied*, 417 U.S. 934, 94 S.Ct. 2647, 41 L.Ed.2d 347 (1974); *United States v. DeMet*, 486 F.2d 816, 822 (7th Cir. 1973), *cert. denied*, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974); *United States v. Addonizio, supra*, 451 F.2d at 74–77; *United States v. Tropiano, supra*, 418 F.2d at 1076–77. The Hobbs Act by its own terms forbids extortion which affects commerce "in any way or degree", 18 U.S.C. § 1951(a), and has accordingly been held to reach even those effects which are "merely potential or subtle". *United States v. Augello*, 451 F.2d 1167, 1169–70 (2d Cir. 1971), *cert. denied*, 405 U.S. 1070, 92 S.Ct. 1518, 31 L.Ed.2d 802 (1972). *See also United States v. Mazzei, supra*, 521 F.2d at 642–43. Indeed, the seventh circuit has gone as far as to require only a "realistic probability that an extortionate transaction will have some effect on interstate commerce". *United States v. Staszcuk, supra*, 517 F.2d at 60. Thus, the instruction was correct.

■ Defendants contend that there was no evidence of even a minimal effect on commerce. Meridian made twice its average profit on the 1971 contract, and performed its obligations to the Authority. However, there was some evidence that the

---

kind of economic interest at stake is of little significance except as it may indicate that the victim had no grounds for fear.

7. Defendants cite only *Bianchi v. United States, supra* (payment to avoid unwarranted work stoppage), and *United States v. Provenzano*, 334 F.2d 678 (3d Cir.), *cert. denied*, 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964) (payments to induce truckers to perform tasks already required under their pre-existing contract).

8. The judge, in defining the requisite impact on interstate commerce, specifically told the jury that if they believe "that the diminution of Meridian profits adversely affects its ability to engage in interstate commerce, even to a minimal degree, the requisite delay, obstruction, or effect upon interstate commerce has been proved." It is questionable, then, whether defendants even characterize the court's charge properly when they say it does not require a showing of adverse effect.

payoffs adversely affected the sums available to Meridian personnel concerned with the project; and, more basically, paying off Baptista of necessity depleted the funds of the company, an out of state firm operating interstate. The latter impact was enough. *See United States v. Mazzei, supra,* 521 F.2d at 642.

■■■ Defendants further contend that the admission of evidence on the question of interstate commerce by a Connecticut subcontractor for WEP, Robert D'Angelis, constituted a prejudicial variance or amendment of the indictment. The argument is frivolous. The language to which defendants refer, mentioning engineering services, appears in the introductory paragraphs of the indictment, not the charging paragraphs; and the charging paragraphs are examined when considering whether there has been a variance between pleading and proof. *Cf. Gaither v. United States,* 134 U.S.App.D.C. 154, 413 F.2d 1061, 1071 (1969). The language of the charging paragraphs fairly covers evidence of the type introduced through D'Angelis.[9] *Cf. United States v. Staszcuk, supra,* 517 F.2d at 55 n. 3, 56.

## II

■■■ Defendants were convicted not only of Hobbs Act violations but also of violations of 18 U.S.C. § 1952, the so-called Travel Act, all the violations arising from the same transactions. The Travel Act provides:[10]

"(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

"(1) distribute the proceeds of any unlawful activity; or

"(2) commit any crime of violence to further any unlawful activity; or

"(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

"(b) As used in this section 'unlawful activity' means . . . (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States. . . ."

The indictment charged defendants with causing others to travel in interstate commerce and to use the facilities of interstate commerce so as to unlawfully solicit, agree to receive, and receive the payment of money in exchange for engineering contracts. 18 U.S.C. §§ 1952 & 2. Their objections go to the elements of travel or use of an interstate facility, and to the nature of the purported "unlawful activity".

■■■ Defendants argue that the court erred in instructing that Graham's interstate travel and Meridian's use of the mail would sustain a conviction under the Travel Act. The court instructed that if the defendants "caused or induced Graham to travel from Philadelphia to New Bedford" or caused Graham to use the mails, the interstate component of the Travel Act would be satisfied. In *Rewis v. United States,* 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971), the Supreme Court, reversing a conviction under the Travel Act, held that the interstate travel of patrons from Georgia to a Florida gambling operation could not be imputed to the defendants, the operation's owners. The Court

---

**9.** *United States v. Stirone,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), on which defendants rely, is entirely inapposite. In that case, the indictment charged interference only with sand shipments, whereas the trial judge's instructions and the proof offered at trial included concrete shipments, part of a later stage in the manufacturing process. The Supreme Court held that there was a variance and reversed. Here the indictment was framed in general language and the proof at trial came within that general language.

**10.** In contrast to the broad interpretation given to the Hobbs Act, the Supreme Court has indicated that the Travel Act is to be read in a narrower and more restricted fashion. *Rewis v. United States,* 401 U.S. 808, 811–12, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493, 496 (1971).

indicated, however, that a violation could occur if a defendant so actively encouraged patrons to travel interstate that his conduct approximated that of a principal in a criminal agency relationship. *Id.* at 814, 91 S.Ct. at 1060, 28 L.Ed.2d at 497. We think the instruction here comported sufficiently with the analysis in *Rewis. See United States v. Marquez,* 449 F.2d 89 (2d Cir. 1971), *cert. denied,* 405 U.S. 963, 92 S.Ct. 1167, 31 L.Ed.2d 239 (1972); *United States v. De Cavalcante,* 440 F.2d 1264 (3d Cir. 1971); 18 U.S.C. § 2(b).

■ The evidence, it is true, was likely insufficient to support a jury finding that Baptista caused Graham to travel to New Bedford.[11] But evidence of Meridian's prearranged use of the mails to forward checks to defendants strongly supported a jury finding of a requisite interstate activity. When Baptista gave Graham the blank invoices for the purpose of making payments, he knew that Meridian was a Pennsylvania-based company and that the addresses on the invoices were in Massachusetts.[12] This use of the mails was more than "incidental", *United States v. Isaacs,* 493 F.2d 1124, 1146–49 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974), for it was an important link in the interchange between defendants and Meridian. *Cf. United States v. Hedge,* 462 F.2d 220, 223–24 (5th Cir. 1972). While the Travel Act is to be construed narrowly, *see Rewis v. United States, supra,* this conduct

falls squarely within the language of 18 U.S.C. § 1952. *See United States v. Archer,* 486 F.2d 670 (2d Cir. 1973).

■ With respect to the element of "unlawful activity", defendants argue that the court erred in allowing the jury to convict upon proof of bribery rather than proof of extortion only. However, the Travel Act, unlike the Hobbs Act, punishes bribery (as well as extortion) that is "in violation of the laws of the State in which committed . . . ." 18 U.S.C. § 1952(b)(2). In charging the jury on the Travel Act counts, the district court stated that a Massachusetts statute, M.G.L. c. 268A § 2(b),[13] was the applicable state law and pointed out, quite properly, a distinction between the elements of extortion in the Hobbs Act counts, and the crime described in c. 268A § 2:

> "It is not necessary to show that there was any duress or compulsion with respect to the agreement to pay or the actual payment in that case. Of course if the transaction between Graham and Baptista does not rise above a voluntary payment upon the part of Graham, the defendants cannot be found guilty on Counts 3 or 5 [the Hobbs Act counts]. They can be found guilty upon counts 4 and 6 [the Travel Act counts] insofar as the unlawful activity is concerned, namely the question of, to describe it briefly, the kickback, if you find that that has

---

11. Graham was not in contact with Baptista immediately prior to his visits and there was no showing that Baptista approached him first. However, use of the mails is sufficient in and of itself, for § 1952 is phrased in the disjunctive, and even though the indictment alleges both travel and use of interstate facilities, the conviction can stand if the evidence establishing one of the means alleged is sufficient. *Turner v. United States,* 396 U.S. 398, 420, 90 S.Ct. 642, 654, 24 L.Ed.2d 610, 625 (1970); *United States v. Barbato,* 471 F.2d 918, 922 n. 3 (1st Cir. 1973).

12. *United States v. Isaacs,* 493 F.2d 1124 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974), which defendants cite is inapposite. There the interstate movement of checks was solely within banking channels after the checks had been deposited and taken

out of the control of the defendants. *Id.* at 1146. *Contra, United States v. Salsbury,* 430 F.2d 1045, 1048 (4th Cir. 1970), where even that limited activity was found to give rise to a violation of the Travel Act.

13. Chapter 268A § 2 is directed in part against:

> "(b) Whoever, being a state, county or municipal employee or a member of the judiciary or a person selected to be such an employee or member of the judiciary, directly or indirectly, corruptly asks, demands, exacts, solicits, seeks, accepts, receives or agrees to receive anything of value for himself or for any other person or entity, in return for
> (1) being influenced in his performance of any official act or any act within his official responsibility . . . ."

been proved to your satisfaction beyond a reasonable doubt."

In so charging, the court declined defendant's requested instruction, that they could be found guilty under the Travel Act counts only if the jury found that their actions constituted extortion.

■ We find no error. Convictions based on findings both of extortion and a violation of the Massachusetts statute would be perfectly consistent. It is true that one not guilty of extortion might still violate the statute. But the court took care of this possibility by explaining to the jury that if no more than a voluntary payment by Graham was found, there could be no Hobbs Act conviction. There was no prejudice in the submission, under the Travel Act, of the broader theory.

■ Defendants also allege a variance between the unlawful activity described in the Travel Act counts and the Government's proof. We find none. While the Travel Act counts initially refer to defendants' actions as "in furtherance of the plan and purpose" to commit the offenses charged in the conspiracy and Hobbs Act counts, they go on to define the specific unlawful activity as the "solicitation, agreement to receive, and receipt of money . . . in return for a contract for engineering services with the New Bedford Redevelopment Authority." This language encompasses the crime set forth in the state statute cited at trial, c. 268A § 2, which is not limited to extortion. *See United States v. Nardello*, 393 U.S. 286, 89 S.Ct. 534, 21 L.Ed.2d 487 (1969).

■ Defendants also objected to the application of M.G.L. c. 268A § 2 to Baptista, asserting that his authority as Executive Director was too slight to bring him within that statute. The statute punishes the solicitation or receipt of money by a public employee in return for being influenced in his performance either of any official act or any act within his official responsibility. § 2(b)(1). Defendants contend that Baptista lacked "official responsibility", defined in § 1(i),[14] as he was empowered only to assist and advise the Authority. Be that as it may, § 2(b)(1) also embraces "official act[s]", defined as "any decision or action in a particular matter[15] or in the enactment of legislation", § 1(h). Baptista's advice and assistance to the Authority, which defendants concede he was empowered to render, would clearly constitute "official acts" under c. 268A § 2(b)(1).

### III

Defendant Hathaway contends that the verdicts against him, based in the substantive counts on the theory of aiding and abetting, 18 U.S.C. § 2, were contrary to the weight of the evidence, and that the district court erred in denying his motions for judgment of acquittal and for a new trial. Hathaway says that there was no showing of the knowledge, intent, and participation requisite for a conviction.

■ To be convicted of aiding and abetting, it is necessary that a defendant in some way "associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938) (L. Hand, J.), *quoted in Nye & Nissen v. United States*, 336 U.S. 613, 619, 69 S.Ct. 766, 769, 93 L.Ed. 919, 925 (1949). Participation in every stage of an illegal venture is not required, only participation at some stage accompanied by knowledge of the result and intent to bring about that result. *Id.*

■ Hathaway paints himself as a shadowy figure, whom Graham never met or

**14.** Section 1(i) defines "official responsibility" as "the direct administrative or operating authority, whether intermediate or final, and either exercisable alone or with others, and whether personal or through subordinates, to approve, disapprove, or otherwise direct agency action."

**15.** " 'Particular matter' [is] any . . . application, submission, request for a . . . contract . . . ." C. 268A § 1(k).

even knew existed. However, while there was some conflicting testimony as to his role,[16] we think the evidence supported a finding that he had knowingly and intentionally participated. Baptista furnished Graham with Hathaway's blank invoices, and Graham mailed checks made out to Hathaway, along with copies of the invoices, to Hathaway. Although none of the bank employees recalled cashing these specific checks, Hathaway was personally known to them, the checks were made payable to him, and his was the sole endorsement. It could be inferred that he alone cashed them. In addition, Baptista's secretary called the bank for Hathaway prior to his cashing checks. From these and related facts, the jury could conclude that there was no reasonable hypothesis but that Hathaway was a willing participant in Baptista's scheme.

■ Hathaway contends that there could be no aiding and abetting as there was no showing of the commission of the crimes by a principal, it not having been established that Baptista obtained property or money from Meridian. However, Graham testified that Baptista told him he received the first payment. And even were this not so, as the checks were cashed by Baptista's personally designated associate, the jury could infer that the benefit was passed on to the principal. *See United States v. Provenzano*, 334 F.2d 678, 686 (3d Cir. 1964).

We likewise reject Hathaway's argument that his conviction as an aider and abettor cannot stand since there was no public officer who acted as principal. As previously discussed, the evidence on this score was adequate as to Baptista.

## IV

■ Defendants contend that the court improperly refused their requested instructions on the two conspiracy counts.[17] They concede that the more general instruction along the same lines which the court gave [18] was correct, but contend that it should have gone further to guard against the Government's purported attempt to prove conspiracy by association alone. However, the Government's proof went well beyond mere association, and association, while not dispositive, is at least relevant. *See United States v. Armone*, 363 F.2d 385, 403–04 (2d Cir.), *cert. denied*, 385 U.S. 957, 87 S.Ct. 391, 392, 17 L.Ed.2d 303 (1966). The court correctly cautioned the jury against paying excessive attention to such evidence. There was no error.

■ Defendants also contend that the evidence was insufficient to prove an agreement. We disagree. While there was no direct proof of an agreement, there was

---

**16.** There was evidence that Hathaway was hospitalized when one of the 1972 checks was cashed, and that the checks were sent to his former residence where no mail reportedly came for him during the years in question.

**17.** Defendants were charged in separate counts with conspiracy in violation of the Hobbs Act, 18 U.S.C. § 1951, and under the Travel Act, 18 U.S.C. § 1952, and 18 U.S.C. § 2 in violation of 18 U.S.C. § 371.

They requested the following instructions:
"23. Evidence of the presence of the Defendant Hathaway in the office of the New Bedford Redevelopment Authority or in the office of the Defendant Baptista on one or more occasions does not establish proof of the existence of a conspiracy between the defendants.

24. Evidence that the Defendant Baptista was in the Southeastern Bank and Trust Company on one or more occasions when the Defendant Hathaway cashed a check there

does not establish proof of the existence of a conspiracy between the defendants."

**18.** The instruction given was:
"Mere association of two persons, the mere presence of one so-called conspirator with another is not enough to prove conspiracy. The acts and conduct of the alleged conspirators must furnish to the jurors for their consideration and for their determination evidence which justifies them in finding intention upon the part of the conspirators to participate in the agreement to commit a crime and to accomplish an unlawful purpose. Mere association or presence of one with the other at any time, at any time during the period of time alleged in the indictment, is not by itself sufficient and it must be the acts and conduct of the defendants, the circumstances under which they acted that can provide for a jury the basis of their determination."

circumstantial evidence of one. The availability of blank invoices and the cashing of the checks give rise to the strong inference that Hathaway and Baptista were working in combination, pursuant to a criminal agreement. The jury could infer that Hathaway knew all along of the use to which Baptista would be putting the blank invoices and that the agreement therefore predated the June, 1971, meeting between Baptista, Graham, and Lucas.[19]

■ As regards each of the two conspiracy counts, defendants contend that at the very most the Government proved conspiracy only in 1972 and not continuing from May, 1971, to December, 1972, as alleged in the indictment. They assert that they were therefore prejudiced by the district court's refusal to require the Government to elect between the separate 1971 and 1972 conspiracies, since the indictment was duplicitous and there was a variance from the indictment as charged. However, we think the evidence was sufficient to show a continuing conspiracy covering both years. The same method of payment was used in both 1971 and 1972; the same parties were involved; the payments were made for the same purpose, procuring engineering contracts from the Authority; and during the meeting in June, 1971, Baptista spoke of the forthcoming NDP project and said that Meridian might be considered. The discontinuity in time between the last WEP payment, in November, 1971, and the meeting about the NDP contract in August, 1972, does not necessarily divide this continuing mode of operation into separate conspiracies. *Compare United States v. Russano*, 257 F.2d 712 (2d Cir. 1958).

V

Finally we deal with defendants' claims of error as to several rulings, the first of which dealt with the right to cross-examine Graham. The Government interrupted its direct examination of Graham in order to call other witnesses. This was done to conform to the district court's requirement that the Government submit all its evidence of conspiracy before submitting any coconspirators' declarations. The court adopted this order of presentation so as to make sure that the quantum of independent non-hearsay evidence was adequate to support the required elements of the conspiracy and defendants' participation in it. *Cf. United States v. Honneus*, 508 F.2d 566, 577 (1st Cir. 1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975) (requiring a timely limiting instruction, though not necessarily this order of presentation).

■ Defendants did not object during the trial either to the order of proceeding or to the court's accompanying rulings and instructions. Now, however, they assert that the court erred by limiting the defense to a single opportunity to cross-examine Graham, and further, that it was plain error to have announced a cut off in the non-hearsay proof prior to Graham's cross-examination. Whatever the pros and cons of the procedure, it was well within the court's discretion so to structure the admission of evidence. The object was not to invite a final determination of guilt or innocence at the conclusion of the Government's non-hearsay case in chief, but rather to protect each defendant against premature jury exposure to the declarations of coconspirators. At the close of trial, by which time Graham had been fully cross-examined, the jury was instructed at great length concerning its duty to weigh the credibility of witnesses and was, of course, told to acquit if not satisfied of guilt beyond a reasonable doubt; it was also instructed then, as earlier, of the need for independent proof of the conspiracy and of defendants' involvement.

■ It is true that the court's limiting instructions after completion of the Government's non-hearsay case did not expressly

---

19. Defendants assert a fatal variance because the indictment alleges that the conspiracy began in May, 1971, and there was no proof of that precise date of its commencement. However, the conspiracy was within the period charged and any discrepancy was insubstantial. *See United States v. Postma*, 242 F.2d 488, 496–97 (2d Cir.), *cert. denied*, 354 U.S. 922, 77 S.Ct. 1380, 1 L.Ed.2d 1346 (1957).

tell the jury to consider the cross-examination yet to come when weighing the Government's proof on the conspiracy counts. But counsel did not request any such instruction or raise any objection, and we cannot discern plain error either in what the court said or did not say at the time. Fed.R.Crim.P. 52(b).

 Defendants also argue that the district court improperly excluded cancelled checks from another company, the Campanella Corp., which had been cashed by Hathaway at the Southeastern Bank. We find no error in the court's exclusion of the proffered evidence as irrelevant or, at least, so marginal that any possible relevance was outweighed by its tendency to mislead and confuse. Fed.R.Evid. 403.

 Defendants also seek to assert alleged improprieties in the grants of immunity to four Government witnesses. *See* 18 U.S.C. § 6003. The short answer is that a challenge to a grant of immunity, like assertion of the privilege against self-incrimination, is personal; defendants are without standing to contest the legal sufficiency of the granting of immunity by the Government to these witnesses. *United States v. Lewis*, 456 F.2d 404, 408–10 (3d Cir. 1972); *cf. Lopez v. Burke*, 413 F.2d 992, 994 (7th Cir. 1969). *See also United States v. White*, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944); *Hale v. Henkel*, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906); *United States v. LePera*, 443 F.2d 810, 812 (9th Cir.), *cert. denied*, 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971); *Long v. United States*, 124 U.S.App.D.C. 14, 360 F.2d 829, 834 (1966); *United States ex rel. Berberian v. Cliff*, 300 F.Supp. 8, 14–15 (E.D.Pa.1969).

 We also find no reversible error in the court's handling of the controversy that surfaced early in the trial concerning non-disclosure of a Government letter promising not to prosecute Meridian employees. The court has discretion in the handling of alleged noncompliance with discovery orders, Fed.R.Crim.P. 16(d)(2), and we find no such evidence of deliberate Government miscon-

duct or prejudice as to require a different disposition from that adopted by the court.

*Affirmed.*